ALL AMERICAS TRADING CORP., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ALL AMERICAS TRADING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 43712, 63567. Filed February 19, 1958.

*Clement J. Clarke, Jr., Esq.*, and *Richard C. Sorlien, Esq.*, for the petitioner.

*Stephen P. Cadden, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in income tax and imposed additions to the tax in the years and in the amounts as follows:

| Docket No. | Year ended March 31 | Deficiency | Additions to tax | |
|---|---|---|---|---|
| | | | Sec. 293 (b) | Sec. 291 (a) |
| 43712 | 1949 | $18,052.28 | $9,026.14 | |
| | 1950 | 18,001.75 | 9,000.88 | |
| 63567 | 1951 | ¹ 740.69 | | |
| | | 7,670.98 | 4,205.84 | $2,102.92 |
| | 1952 | 731.67 | 365.84 | 182.92 |

¹ Only excess profits tax deficiency.

At the hearing of these cases, respondent stated that the deficiencies and additions to the tax for the years 1949 and 1950 should be reduced to the following amounts:

| Year | Deficiency | Additions to tax, sec. 293 (b) |
|---|---|---|
| 1949 | $3,558.54 | $1,779.27 |
| 1950 | 3,286.69 | 1,643.35 |

The main issues are: (1) Whether certain moneys received by Joseph Avirgan as rebates, commissions, or "kickbacks" resulted in unreported income to the petitioner in the years involved, and (2) if issue (1) is decided against the petitioner, whether petitioner in not reporting the amounts in question as income did so fraudulently with intent to evade tax within the meaning of section 293 (b) of the Internal Revenue Code of 1939.

### FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

The petitioner is a corporation organized on April 15, 1948, under the laws of Pennsylvania. The petitioner filed income tax returns on an accrual basis for its fiscal years 1949 and 1950, with the then collector of internal revenue for the first district of Pennsylvania. The petitioner is an accrual basis taxpayer.

Joel Tandeter, hereinafter referred to as Tandeter, and Joseph Avirgan, hereinafter referred to as Avirgan, organized the petitioner. Tandeter and his daughter Pauline Tandeter invested a total of $20,000 and received 200 shares of stock. Avirgan and his brother Jerome Avirgan each invested $2,500 and each received 25 shares of stock. Each share had a par value of $100. The original officers of the corporation elected at a meeting of the board of directors, composed of Tandeter, Avirgan, and Jerome Avirgan, held on May 4, 1948, were:

Joseph Avirgan_____President
Joel Tandeter_____Treasurer
Jerome Avirgan_____Secretary
Pauline Tandeter_____Assistant Secretary
Joseph Kerner_____Assistant Treasurer

It was provided by agreement of the parties that the Avirgans and Tandeters should have equal voting control, regardless of total investment, and should share equally in the corporate profits.

Jerome Avirgan sold his stock in the petitioner to Tandeter on September 21, 1949, and terminated all relationships with petitioner at that time. Avirgan sold his stock to Tandeter on June 21, 1950, pursuant to an agreement between Tandeter (and on behalf of Pauline) and Avirgan dated June 16, 1950. This agreement further provided that as part of the consideration for the sale of stock, Avirgan was to be employed by petitioner and Joel Tandeter, for

1 year, as president and general manager, though he had already been given the title of president, at a salary of $200 a week. Thirty days' written notice was required by either party to terminate this agreement. Upon termination, Avirgan was to have certain options to purchase corporate equipment and supplies at cost and the right to do business with petitioner's customers. On April 19, 1951, Tandeter notified Avirgan either by telegram or orally that his employment as president of petitioner was terminated. At that time, Tandeter made his first request for the moneys that Avirgan had received. Tandeter was at that time sole stockholder of petitioner, excepting the shares held by his daughter, and one share held by Avirgan as Tandeter's nominee, pursuant to the agreement of June 16, 1950.

The petitioner in the taxable years involved was engaged in the business of buying automotive parts and accessories from various suppliers and exporting them to Tandeter in Argentina. Although given the title of president, Avirgan's main function was that of a purchasing agent. Tandeter actually directed and controlled the corporate operations, giving complete instructions to Avirgan on how to conduct the business of petitioner. Avirgan and Tandeter both had the power to sign corporate checks. Avirgan would contact the suppliers and arrange for the purchase of these automobile parts by petitioner. In the course of negotiating these purchase arrangements, the suppliers agreed, usually orally, to pay Avirgan or his nominee a percentage of the purchase price charged petitioner. Avirgan was experienced in the automotive parts export business and was able to secure the going prices, where ascertainable, for petitioner and sometimes a more favorable price. However, if the kickback arrangement had not been agreed upon, some of the suppliers would and others would not have given the same discount to petitioner by charging it a "net price." These payments ran as low as 2 per cent in several instances; some were at 3 per cent, others at 5 per cent, and one dealer paid from 5 to 30 per cent. Usually, these payments would be made immediately or monthly only after the supplier had been paid by petitioner. Further, several suppliers paid an additional percentage, about 6 per cent, annually to Avirgan, such payment being dependent on the manufacturer's paying the particular supplier a rebate. These payments were always made by check, with one exception hereinafter discussed, payable to Avirgan, to his brother Jerome, or to Avirgan's nominee, the Waale Company. The Waale Company was a partnership of Avirgan and Jerome, organized for manufacturing and distributing detergents and soaps. Ultimately Avirgan received the proceeds of these checks, the biggest percentage of which he kept in cash in his home.

Most of the suppliers knew that Avirgan was petitioner's president, though at least two suppliers learned that he held that title only after they had agreed to the kickback arrangement. They made the payments to him, following the custom of the trade, primarily because it was he who brought the business to them, and promised them a considerable volume of business. While the payments to Avirgan were made after the suppliers had received their payments from petitioner, the suppliers were not restricted in the use of the moneys so obtained and no funds were set aside by the suppliers for payment to Avirgan.

Generally, petitioner's order blanks for these supplies were given to the supplier and Avirgan would sign petitioner's checks in payment of the purchases.

The suppliers in making the payments to Avirgan would usually issue a credit memorandum to petitioner's account. In at least one instance, the credit was made to Avirgan's account. The following payments were made to Avirgan in the years in question:

| Supplier | Fiscal year ended March 31 | | | |
|---|---|---|---|---|
| | 1949 | 1950 | 1951 | 1952 |
| Central Motor Parts Co | $12,848.77 | $4,231.28 | $5,684.62 | |
| Broadway Motor Parts | | | 5,519.04 | |
| Berry Bros | | 1,071.11 | | |
| Approved Auto Parts | | | 742.71 | |
| Davis Buick | | | 2,602.25 | $1,967.43 |
| Porter Motor Company | 1,464.85 | 4,512.93 | 1,494.09 | |
| Keeley Chevrolet | 954.52 | 4,072.81 | 6,485.02 | |
| Murray Auto Specialty | | | 393.62 | |
| L & S Bearing Co | | | 2,408.40 | 593.40 |
| University Motors | 273.70 | | | |
| Diets & Wadsworth | | | 125.00 | |
| Henry Rosen (H R Sales) | | | 3,894.07 | |
| Automotive Sales (Morris Shienfield) | | 1,339.34 | 220.50 | |
| Total | 15,541.84 | 15,227.47 | 29,569.32 | 2,560.83 |

Further, the sum of $2,734.57 payable to Avirgan by Keeley Chevrolet, Inc., for transactions in the fiscal year ended March 31, 1952, was paid to petitioner by Keeley Chevrolet, Inc., in 1955, after the entry of the State court judgment discussed below. The Commissioner contends that this amount should be included in the petitioner's income of the fiscal year ended March 31, 1952. All other amounts were paid to Avirgan by check with the exception of a new Buick automobile, which was received by Avirgan from Davis Buick, on February 28, 1951, in lieu of $2,602.25. It is only these above-mentioned payments, including the Buick automobile, which the Commissioner contends should be added to the petitioner's income for the years in question.

Avirgan believed that he was entitled to these payments pursuant to an oral agreement or understanding with Tandeter to that effect. He considered these payments his own and not petitioner's income. However, on June 5, 1951, Tandeter and Pauline Tandeter entered

suit against Avirgan and others in Court of Common Pleas No. 7, Philadelphia County, June term, 1951, No. 158, claiming that petitioner was entitled to recover the above payments made by petitioner's suppliers to Avirgan or his nominee, and also alleging that Avirgan owed them other sums of moneys from other transactions not otherwise here involved. By amended answer to bill of complaint and in oral testimony at that trial, Avirgan stated that he performed his duties properly and that he was entitled to all compensation, income, and profits received by him in connection therewith, including the payments in issue from suppliers. He testified that he retained such payments pursuant to an oral understanding with Joel Tandeter. The case went on trial on February 9, 1954. Pursuant to settlement between the parties, judgment was entered in favor of petitioner against Avirgan on June 22, 1955, in the amount of $72,265.43, and a check in the amount of $2,734.57 was paid to petitioner by Keeley Chevrolet, Inc. At the time judgment was entered, Avirgan had a net worth of $3,000 or $4,000. Execution has never been issued on the State court judgment.

None of the proceeds of suppliers' checks, payable to Avirgan or to his nominee, were ever reflected on the books and records of petitioner. In the petitioner's income tax returns for fiscal years 1949 and 1950, the total invoice prices charged by the suppliers were included in its cost of goods sold; no deduction from cost was made for the payments to Avirgan. Likewise, these payments were not added to the gross receipts shown on the returns. Both returns were signed by Avirgan as president; Jerome Avirgan signed the fiscal 1949 return as secretary, and Tandeter signed the fiscal year 1950 return as treasurer. No returns were filed for fiscal years 1951 and 1952, and petitioner had no income in these 2 years, for the purposes of these proceedings, excepting the payments to Avirgan. The petitioner ceased doing business on April 19, 1951, but is still in existence as a corporation under the laws of Pennsylvania.

The amounts in question were not accruable income to petitioner during the tax years involved.

### OPINION.

The Commissioner contends that the kickbacks received by Avirgan resulted in unreported income to petitioner during the years in question in that they reduced its cost of goods sold, or, were themselves items of income to the petitioner. The petitioner contends that Avirgan held these payments as his own under a claim of right, pursuant to arrangements with the suppliers, and that the petitioner had no established claim to these payments during the years in controversy.

We agree with the petitioner.

The source of these payments received or receivable by Avirgan was not the petitioner, but was the suppliers. They delivered the supplies to petitioner, were paid by the petitioner, and with their own funds paid the commission to Avirgan. The Commissioner's contention that the payments are traceable from petitioner's treasury is not sustainable on the facts.

While Avirgan's tax liability is not in issue, his understanding in regard to and intent in receiving these payments is relevant to the question before us. He consistently in the State court proceedings, and before this Court claimed and testified that he was entitled to these payments pursuant to an oral understanding with Tandeter. The judgment of the State court is not in evidence and we do not know its precise legal basis, but even if Avirgan was held liable in a later year to return the amounts in controversy to Tandeter, it would not alter the fact that he held the payments under a claim of right during the years in question. *Healy* v. *Commissioner*, 345 U. S. 278 (1953), affirming 194 F. 2d 662 (C. A. 2, 1952), which had reversed 16 T. C. 200 (1951). It is true that the testifying suppliers referred to the payments as "credits," "overriding discounts," "rebates," "refunds," and "usual trade allowances," as well as "commissions" and "kickbacks." However, the nature of the agreements between the suppliers and Avirgan is better evinced by what was done than by the term a particular supplier happened to use to designate the payments. The suppliers paid and intended to pay Avirgan, or whomsoever he nominated, these commissions or kickbacks, pursuant to the custom of the trade. Avirgan held these kickbacks as his own under a claim of right and not on behalf of the petitioner. *Henry C. Boucher*, 18 T. C. 710 (1952).

In view of Avirgan's position in the petitioner the Commissioner contends that his receipt of or right to receive these payments from the suppliers should be considered the petitioner's. See *Drybrough* v. *Commissioner*, 238 F. 2d 735, remanding *United Mercantile Agencies, Inc.*, 23 T. C. 1105 (1955). *Estate of Helene Simmons*, 26 T. C. 409 (1956); *United Dressed Beef Co.*, 23 T. C. 879 (1955); *Currier* v. *United States*, 166 F. 2d 346 (C. A. 1, 1948). However, in these cases the recipients of the income were either majority shareholders or by other means controlled the corporations there involved. Avirgan was only a minority shareholder, although he was entitled to 50 per cent of the profits, until June 21, 1950, after which date he held no beneficial title to any stock. He was only the nominal president of petitioner, although having the power to sign checks binding the petitioner. He was in reality only a purchasing agent, with Tandeter in actual control of the petitioner. Avirgan cannot be regarded as acting for the corporation in receiving the kickbacks. *Harry Sherin*, 13 T. C. 221 (1949). In *J. J. Dix, Inc.*, 223 F. 2d 436 (C. A. 2, 1955),

affirming in part and reversing in part a Memorandum Opinion of this Court dated May 20, 1953, relied on by the Commissioner, it was agreed by the parties that the misappropriated moneys were corporate funds. That case is not controlling here.

Even if it be true, as the Commissioner contends on brief, that the State court decided that these payments were income to the petitioner, that judgment cannot aid him here. The State court judgment was not entered until June 1955, long after the tax years in question. The claim made by the plaintiff in that case, the petitioner here, was strenuously contested by Avirgan, and until the termination of that controversy, petitioner had no established right to these amounts and could not properly accrue them as income for the years in question. See *Cold Metal Process Co.*, 17 T. C. 916 (1951) ; *Boston Elevated Railway Co.*, 16 T. C. 1084 (1951). Further, the command over this income, the primary test of taxability, was in Avirgan, and not in petitioner during the years in question. The fact that the payments were the result of the corporate petitioner's transactions does not of itself make the payments corporate income. *Harry Sherin, supra.*

We have carefully considered the Commissioner's contentions and find that they do not adequately support his conclusion. Since the petitioner has demonstrated that these payments were not income during the years in question, we need not consider its alternative contentions.

The Commissioner's determination of an addition for fraud and an addition to tax for failure to file cannot be sustained where the petitioner owes no deficiency, and had no unreported income during the years in controversy.

We hold that the payments in question received or receivable by Avirgan were not accruable income to petitioner during the years before us.

*Decisions will be entered for the petitioner.*