ASPHALT INDUSTRIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1379–63.   Filed August 19, 1966.

*Robert M. Taylor,* for the petitioner.
*Dennis C. DeBerry,* for the respondent.

The Commissioner determined deficiencies in income tax against the petitioner for the fiscal years ended the last day of February 1955–60 as follows:

| Year ended— | Deficiency | Sec. 6653(b) addition for fraud |
|---|---|---|
| Feb. 28, 1955 | $11, 389. 56 | $6, 239. 54 |
| Feb. 29, 1956 | 16, 371. 01 | 9, 151. 22 |
| Feb. 28, 1957 | 25, 217. 58 | 14, 144. 47 |
| Feb. 28, 1958 | 14, 847. 77 | 8, 484. 48 |
| Feb. 28, 1959 | 14, 527. 53 | 7, 744. 77 |
| Feb. 29, 1960 | 13, 819. 39 | 6, 909. 70 |

At issue is whether Asphalt Industries, Inc., filed false and fraudulent returns with intent to evade taxes in each of the years in question, and whether it sustained theft losses in all or any of those years.

### FINDINGS OF FACT

The facts stipulated by the parties together with accompanying exhibits are incorporated herein by this reference.

Asphalt Industries, Inc. (hereinafter referred to as Asphalt), is a corporation organized on May 9, 1935, under the laws of the Commonwealth of Pennsylvania, having its principal place of business in Chester, Pa. It maintained its books and records on an accrual basis of accounting and for each of its fiscal years ended the last day of February, 1955 through 1960, filed corporate income tax returns with the district director of internal revenue, Philadelphia, Pa.

Asphalt was engaged in the business of selling asphalts, tars, and other road-building material to townships and private contractors in the southeastern Pennsylvania area. In those instances in which Asphalt dealt with townships, it would make bids along with other suppliers taking into account the "haul and type of material." Copies of the bids made by Asphalt were kept on file in its office. In the case of a private contractor Asphalt would simply quote a price.

In servicing its customers, Asphalt would send specially built distributor trucks to an oil refinery where the truck would be filled with liquid asphalt. The truck would then proceed to the jobsite and spray the contents on the road surface under pressure. Asphalt did not engage in the actual road construction. The drivers of the trucks were given prenumbered delivery tickets which were filled in with the name of the customer to whom delivery was made, the project involved, the number of gallons delivered, the truck making the delivery, the signature of the driver, and the signature of the foreman at the job. During the years here involved, Asphalt employed six truck drivers and used the following equipment: Four distributor trucks, two tractors, and eight trailers.

During each of the years involved herein the following persons were the officers and stockholders of Asphalt:

| Name | Office | Stockholdings |
|---|---|---|
| | | Percent |
| Conrad V. Anderson, Jr. | President | 50 |
| Richard Schwoebel | Secretary-treasurer | 50 |
| Arthur Sanford | Vice president and assistant-secretary | None |

All three of these persons were also directors of the corporation.

In 1946, all of the stock in Asphalt was owned by Ted Artelt. During that year Richard Schwoebel purchased 50 percent of the Asphalt stock from him. Schwoebel had attended grammar school

for 8 years and high school for 2 years in Philadelphia. After leaving school, Schwoebel worked as a landscape architect, and from 1927 to the present he has operated a landscaping business as a sole proprietorship and devoted most of his time thereto.

In 1950, Artelt sold his remaining 50-percent interest in Asphalt to Conrad V. Anderson, Jr. Although Schwoebel and Anderson thereafter each owned one-half of its stock, the regular operation of Asphalt's business was conducted by Anderson with the assistance of Arthur Sanford, who was an officer and director of Asphalt although not a shareholder thereof. Aside from the regular annual meeting, corporate meetings were held whenever necessary but without any regularity, and many matters were resolved informally, often by telephone at night.

Anderson was in charge of all the day-to-day operations. He devoted his full time to Asphalt and supervised jobs being serviced by it. Among other things, he also opened mail and received check payments from customers; had authority to deposit business checks in Asphalt's bank account; signed the bids submitted to and the contracts entered into with townships on behalf of Asphalt as president thereof; and signed checks of Asphalt for expenses. In addition, he kept "close tabs on the bookkeeping end of the business."

Sanford also devoted his full time to Asphalt and was in charge of the operation of the office and the bookkeeping. Among other things, Sanford kept and made the entries in Asphalt's books; opened mail and received check payments from customers; dispatched trucks to deliver materials to jobs, giving the driver a prenumbered delivery ticket; and sent out invoices prepared from the delivery tickets returned to him by the drivers. The invoices were not numbered.

Schwoebel devoted only a minor portion of his time, possibly only about 10 percent thereof, to Asphalt's business. However, as a result of personal contacts with many contractors, presumably arising from his landscaping business, Schwoebel contributed substantially to Asphalt's sales. His activities in respect of Asphalt's business also included the occasional supervision of a job, between 12 and 30 times per year; taking part in discussions that involved major expenditures or policy changes on the part of Asphalt; and discussing matters with Anderson over the telephone at night. In general, however, Schwoebel relied upon Anderson and Sanford "pretty much for the whole operation," and did not concern himself to any substantial extent with the day-to-day operation of Asphalt's business as long as it was making a profit.

During the fiscal years here involved the reported compensation for Asphalt's officers was as follows:

| Fiscal year | Anderson | Schwoebel | Sanford |
|---|---|---|---|
| 1955 | $25,010.74 | $4,000.00 | $8,125.00 |
| 1956 | 26,512.29 | 3,999.96 | 8,020.00 |
| 1957 | 35,868.84 | 8,666.78 | 8,435.00 |
| 1958 | 32,442.37 | 8,000.88 | 13,522.00 |
| 1959 | 31,675.04 | 8,000.88 | 11,521.00 |
| 1960 | 32,129.31 | 8,000.00 | 11,029.48 |

In addition to salaries Anderson and Sanford received bonuses which are reflected in the above figures. Schwoebel received only a straight salary.

The only year in which Asphalt ever declared any kind of dividend was its fiscal year ended February 29, 1956. During that year Asphalt declared a stock dividend thereby increasing the number of shares held equally by Anderson and Schwoebel, and a cash dividend in the reported total of $1,340. Asphalt's earned surplus and undivided profits at the end of each of the fiscal years here involved was reported to be as follows:

| Year | Amount |
|---|---|
| 1955 | $114,824.41 |
| 1956 [1] | 81,235.84 |
| 1957 | 99,022.56 |
| 1958 | 114,593.77 |
| 1959 | 127,020.38 |
| 1960 | 142,511.56 |

[1] The decline in amount of earned surplus and undivided profits is primarily attributable to the stock dividend declared by Asphalt pursuant to which $67,000 was transferred from earned surplus to capital stock.

For the fiscal years involved Asphalt's Federal income tax returns reported receipts from sales in the following amounts:

| Fiscal year ending on last day of February | Reported receipts |
|---|---|
| 1955 | $338,673.38 |
| 1956 | 357,292.85 |
| 1957 | 394,800.39 |
| 1958 | 416,193.16 |
| 1959 | 373,274.29 |
| 1960 | 336,638.86 |

During these years Asphalt made sales to seven Pennsylvania townships and received payments therefor which were not included in the foregoing reported receipts. Such unreported sales were in the following aggregate amounts:

| Township | Taxable years ended— | | | | | |
|---|---|---|---|---|---|---|
| | Feb. 28, 1955 | Feb. 29, 1956 | Feb. 28, 1957 | Feb. 28, 1958 | Feb. 28, 1959 | Feb. 29, 1960 |
| East Goshen, Pa | | $4,324.80 | $8,173.99 | | | |
| Highland, Pa | $6,534.00 | 6,959.06 | 9,691.88 | $1,500.00 | $7,530.00 | $4,055.38 |
| London Grove, Pa | 4,525.70 | 4,736.80 | 6,138.08 | 4,031.78 | 3,394.46 | 3,609.47 |
| New Britain, Pa | 4,593.51 | 5,760.80 | 10,390.14 | 8,945.46 | 9,346.92 | 9,069.26 |
| Upper Makefield, Pa | | 3,679.50 | 2,994.68 | 3,803.76 | | 3,784.00 |
| Upper Southampton, Pa | | | 3,326.80 | 4,487.50 | 3,855.40 | |
| Warminster, Pa | 6,249.78 | 6,021.76 | 7,779.66 | 5,784.90 | 3,810.76 | 6,057.64 |
| Total | 21,902.99 | 31,482.72 | 48,495.23 | 28,553.40 | 27,937.54 | 26,575.75 |

Checks were received from the townships drawn to the order of Asphalt in payment for the above sales. The checks so received were endorsed by Anderson and cashed by him at Asphalt's business bank, the First Pennsylvania Banking & Trust Co., Wayne, Pa. The proceeds of the checks were paid by the bank to Anderson, and he diverted them to his own personal use.

None of the payments to Asphalt from the townships in the amounts listed above were entered in Asphalt's books or reported as income on its income tax returns for the years here involved. However, during those years Asphalt did have income from other sales made to those townships which was reflected in its books and reported on its income tax returns. All costs and expenses relating to the unreported sales including salaries, depreciation, costs of equipment operation, and costs of goods sold were deducted by Asphalt from the gross receipts reported on its income tax returns for the years in which the sales were made.

Sanford was aware of the diversions of income made by Anderson, and assisted Anderson in the making and concealment of them. He failed to record the sales or receipt of the checks in the corporate books and removed the delivery slips and vouchers from the regular corporate files. In at least some instances he signed copies of vouchers marked paid which were returned to the appropriate township although he knew such checks were being cashed by Anderson for his own personal use. And, along with Anderson he signed the following letter dated September 10, 1958, to the First Pennsylvania Banking & Trust Co.

ASPHALT INDUSTRIES, INC.

SEPTEMBER 10, 1958

S. WOODWARD COOK
*First Penna. Banking & Trust Co.*
*Wayne, Pennsylvania*

DEAR SIR:

This is to notify you that Conrad V. Anderson, Jr., President is authorized to cash checks made payable to Asphalt Industries, Inc.

Very truly yours,

ASPHALT INDUSTRIES, INC.
CONRAD V. ANDERSON, JR., *President*
ARTHUR F. SANFORD, *Assistant Secretary*
[SEAL]

On November 12, 1960, Anderson died. Prior to that time Schwoebel had no knowledge of the diversions of corporate funds to Anderson, or the fact that Asphalt's income had not been properly recorded on its books or on its returns. The annual audits of Asphalt's books made by a certified public accountant in each of the years failed to uncover the situation.

Schwoebel himself did not check any of Asphalt's books and records other than its annual reports and tax returns after they had been prepared. The annual reports and tax returns of Asphalt were prepared by a certified public accountant and for the fiscal years ended the last day of February, 1955 through 1959, the returns were signed by Anderson as president. For the fiscal year ended February 29, 1960, Asphalt's income tax return was signed by Sanford as vice president.

Shortly after Anderson's death, Schwoebel's suspicions were aroused concerning the manner in which the funds of Asphalt had been handled. Upon checking through Asphalt's books and records he discovered that corporate funds had been expended to purchase things for Anderson's personal use. Schwoebel then went to the First Pennsylvania Banking & Trust Co. where he was shown the letter of September 10, 1958, signed by Anderson and Sanford, and informed that checks made payable to Asphalt had been cashed by Anderson. Thereafter, in December 1960 or January 1961, Schwoebel questioned Sanford about the checks cashed by Anderson, whereupon Sanford produced invoices for the sales made to the seven townships previously set forth herein, the proceeds of which were represented by the cashed checks. Although the invoices were in Asphalt's office they had been removed from the regular corporate files and had not been seen by Schwoebel or the auditors prior to this time.

After discovering all of the facts relating to the cashed checks, Schwoebel, through his attorney, notified the Internal Revenue Service and informed it of the situation. The determination made by the Commissioner arose out of the investigation made pursuant to that notification and resulted in the mailing of the deficiency notice on January 7, 1963.

At the time of trial Schwoebel was president of Asphalt and a 50-percent shareholder thereof. Anderson's estate was the owner of the remaining 50 percent. Anderson and Schwoebel had an agreement that on the death of one of them the corporation would buy out his interest. The consummation of the purchase of Anderson's interest from his estate is being postponed until after the decision in this case when a more accurate value can be placed on the shares. After such purchase Schwoebel will be the 100-percent owner of Asphalt. Sanford is still a director of Asphalt and also secretary thereof. Schwoebel felt that it was necessary to retain his services in order to keep the business running.

In 1964, Asphalt filed a claim against Anderson's estate for the diversions of corporate funds which are the basis of the Commissioner's determination. The estate is opposing that claim on the basis that Asphalt, through its agents, "had knowledge or by use of due diligence could and should have had knowledge" of Anderson's actions, and therefore condoned them.

Petitioner's return for its fiscal year ended February 29, 1960, was filed August 16, 1960.

The deficiency notice herein was mailed January 7, 1963.

The return for each of the years involved herein was false or fraudulent with intent to evade tax.

At least a part of the underpayment of tax required to be shown on the return for each of the years involved herein is due to fraud.

OPINION

RAUM, *Judge:* The Commissioner determined that Asphalt fraudulently omitted from its returns the proceeds of certain sales made by it during its fiscal years 1955–60. The fact that such sales were made by it, that it actually received checks in payment therefor, and that such sales should have been reported in its returns is not in dispute.

As we understand petitioner's position, it is first, that there were offsetting theft deductions for each of the years because petitioner's president, Anderson, diverted the proceeds of the checks to his own personal use, and second, that its returns were not fraudulent, with the consequence not only that the 50-percent additions for fraud were improperly imposed but also that the statute of limitations would in any event bar assessment.

1. We may readily dispose of the first contention. Assuming that Anderson's diversions constituted embezzlements or thefts—a matter in dispute between the parties—no deductions therefor would be available during any of the tax years. A theft loss is deductible only in the year in which the loss is discovered, sec. 165(e), I.R.C. 1954; *James J. Donohue*, 39 T.C. 91, affirmed and modified 323 F. 2d 651 (C.A. 7), certiorari denied 376 U.S. 911, and it is undisputed that any loss in the present case was not discovered until after Anderson's death, which occurred after the last of the fiscal years involved herein.

2. The Commissioner must establish the requisite fraud by clear and convincing evidence to support the 50-percent additions to tax under section 6653(b), I.R.C. 1954, as well as to lift the bar of the statute of limitations as to the years in respect of which the statutory 3-year period had elapsed.[1] Sec. 6501(a) and (c). We have found that he has successfully carried that burden of proof.

---

[1] It is undisputed that, apart from fraud, the period of limitations had expired as to all the years involved except the fiscal year ended February 29, 1960. The deficiency notice was sent within 3 years after the return for that year had been filed. Accordingly, the basic deficiency for that year must in any event be approved. But the Commissioner must prove fraud for all years, including the last one, to justify the 50-percent addition.

It is not controverted that the returns for each of the tax years omitted sales made by petitioner in substantial amounts for which petitioner had received checks or that such amounts should have been reported in the returns. Anderson, as president, signed the returns for each of the first 5 years before us and Sanford, as vice president, for the sixth year. Each was fully aware that these sales were omitted. The returns were false, and these two officers knew it. They constituted two of the three officers of the corporation and were a majority of its board of directors. Anderson was plainly the dominant stockholder in the enterprise, and Anderson and Sanford together were principally responsible for conducting its affairs. Schwoebel, although the owner of 50 percent of the stock, plainly played a secondary role in petitioner's activities. It is elementary that a corporation can act only through its officers and agents, and Anderson and Sanford as such were acting on petitioner's behalf when they knowingly signed and filed returns for it which falsely omitted the sales in question. These returns were false and fraudulent; and the evidence is thus amply sufficient for the requisite finding of corporate fraud under sections 6501 and 6653. Cf. *Auerbach Shoe Co.* v. *Commissioner*, 216 F. 2d 693 (C.A. 1), affirming 21 T.C. 191; *Currier* v. *United States*, 166 F. 2d 346 (C.A. 1), affirming 70 F. Supp. 219 (D. Mass.); *Ace Tool & Eng., Inc.*, 22 T.C. 833. The corporate fraud perpetrated on its behalf by Anderson and Sanford, acting in concert, is not vitiated by the fact that it was intended at the same time to conceal the individually improper acts of Anderson in diverting the sales proceeds to himself.

As already noted, Anderson and Sanford dominated the corporation's affairs, and the situation is thus to be distinguished from *Botwinik Brothers of Mass., Inc.*, 39 T.C. 988, where the embezzling officer was merely a minority stockholder and did not dominate the business of the corporate victim. This case is more closely analogous to *Irving S. Federbush*, 34 T.C. 740, where the embezzling officer-stockholders together owned a majority of the stock and in fact controlled its affairs to the disadvantage of an innocent minority stockholder who owned one-sixth of the stock. Although the innocent stockholder herein owned 50 percent of the stock, both cases have in common the important factor that the wrongdoing officers were in control of the corporation's activities and acted for it in filing the false returns. And in *Federbush*, as in the instant case, the innocent stockholder caused an action to be filed against the wrongdoer seeking relief for the injury which the corporation sustained.[2]

Nor is this case like *Harry Sherin*, 13 T.C. 221, relied upon by petitioner herein. There a corporation was held not accountable for tax

[2] Indeed, in *Federbush* the offending stockholders were required to resign as officers and directors, and the Court ultimately rendered a money judgment against the defendants in favor of the corporation. Although Anderson's estate is contesting the action instituted against it on behalf of Asphalt, we have no reason to doubt that the corporation similarly has a valid claim.

on income in respect of "commissions" received by a 50-percent stockholder, the reason being that such stockholder was acting in his own behalf in the transactions in question and that such "commissions" never became the income of the corporation.[3] Cf. *All Americas Trading Corp.*, 29 T.C. 908. Here, on the other hand, it is uncontroverted that the sales proceeds in issue were properly includable in petitioner's gross income. The sales were made by the corporation, and the corporation received payment therefor. The returns omitting such sales, signed by the corporate officers who controlled its affairs and who knew they were false, were fraudulent with intent to evade tax. The resulting underpayment of tax was due to fraud.

*Decision will be entered for the respondent.*

[3] Similarly, even where amounts received by the offending stockholder have been held to be income to the corporation, the Court has found absence of fraud on the part of the corporation where there was a reasonable basis for thinking that such amounts might not be corporate income. *United Dressed Beef Co.*, 23 T.C. 879, 887–888. In the present case, however, the checks received by petitioner in payment for the omitted sales were plainly income to it, and there is no suggestion that Anderson and Sanford thought otherwise.