LEO SHAHEEN, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shaheen v. Commissioner
Docket No. 14299-85.
United States Tax Court
T.C. Memo 1987-486; 1987 Tax Ct. Memo LEXIS 482; 54 T.C.M. (CCH) 661; T.C.M. (RIA) 87486; September 28, 1987. Jack Crawley, Jr., for the petitioner. *483 James E. Gray, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Addition to Tax
Year
Deficiency
[1] Sec. 6653(b) 1978
$ 12,594.76
$ 6,297.38
1979
3,507.40
1,753.70  1980
18,663.70
9,331.85  1981
8,762.70
4,381.35  The issues that we must decide are: (1) whether petitioner received unreported income in each of the years at issue; (2) if so, whether petitioner's failure to report the income was due to fraud; and (3) whether the statute of limitations bars the assessment and collection of any deficiencies found to exist for 1978, 1979, and 1980. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Background
Petitioner was a resident of *484 Raleigh, North Carolina, when he filed his petition herein. He timely filed individual Federal income tax returns for each of the years at issue. Petitioner was born and raised in North Carolina. When he was a child, his parents owned and operated a grocery store in Raleigh. When he was in high school, petitioner helped his parents run their grocery store. [2] Petitioner graduated from high school in 1953 and was drafted into the army. He received a six month deferment of his induction to enable his parents to sell the grocery store. Petitioner's parents did not work after they sold their grocery store. They instead sold their home and moved to a modest rental home. Petitioner spent two years in the Army. After he was discharged, he returned to Raleigh to live with his parents and start a scrap metal business. In 1968, he purchased the home he and his parents lived in. His $ 81 a month mortgage payments are scheduled to continue through 1988. Petitioner gave all the money he earned to his mother. [3] She handled all of the family's *485 money. Instead of depositing the family funds in a bank, she hid them in the family home. At first, she stored the cash under her mattress. In early January 1970, she moved the cash to an empty compartment in the back of her washing machine so that it would be more difficult for robbers to locate. About the same time, petitioner used part of his savings to purchase United States savings bonds. Petitioner's father died in 1961 and his mother died in 1970. Petitioner received $ 1,500 of life insurance when his mother died. After his mother died, petitioner took charge of the family savings. In June 1973, he began to invest his current earnings and cash from the savings in interest paying certificates of deposit and savings accounts. He shopped to obtain the highest yields. He was so concerned about maximizing his yields that he redeemed his savings bonds and invested the proceeds in a certificate of deposit that yielded a higher rate. By the end of 1977, petitioner had a total of slightly more than $ 100,000 invested in interest paying certificates of deposit and savings accounts. Of that amount, *486 $ 64,000 was invested in certificates of deposit. During the years 1953, and 1956 through 1969, petitioner received the following amounts of earned income: Year
Income
1953
$ 102.75
1956
1,418.00
1957
2,083.60
1958
1,953.78
1959
2,353.07
1960
2,173.33
1961
2,206.03
1962
2,219.11
1963
2,271.35
1964
2,748.77
1965
2,963.96
1966
2,986.45
1967
3,499.30
1968
3,942.00
1969
4,703.00
Total    $ 37,624.50
Petitioner's earned income for the years 1961 through 1969 consisted entirely of his earnings from his scrap metal business. For the years 1970 through 1981, petitioner reported the following amounts of adjusted gross income on his Federal income tax returns: Reported Adjusted
Year
Gross Income
1970
$ 5,005.93  1971
6,162.74    1972
8,128.00    1973
9,941.70    1974
16,694.00   1975
17,992.00   1976
20,018.62   1977
22,338.00   1978
27,399.00   1979
35,081.45   1980
43,740.00   1981
58,397.00   Total    $ 270,898.44
The above amounts of adjusted gross income include the following reported results from petitioner's scrap metal business. *487 Other
Gross
Cost of
Business
Net
Year
Receipts
Goods Sold
Expenses
Profit
1970
$ 12,808.57
$ 6,676.01
$ 1,126.63
$ 5,005.93
1971
16,532.00
9,086.46
1,282.80
6,162.74
1972
17,873.33
8,325.57
1,420.07
8,127.69
1973
21,511.94
10,807.05
1,415.57
9,289.32
1974
17,333.43
6,571.25
1,466.85
9,295.33
1975
21,804.46
6,677.06
1,985.41
13,141.99
1976
37,742.95
21,121,05
2,491.81
14,130.09
1977
48,558.82
30.433.32
2,604.02
15,521.48
1978
69,047.84
47,729.44
3,257.92
* 18,060.48
1979
75,070.00
49,270.00
3,546.03
22,253.97
1980
65,442.83
44,823.25
4,504.93
* 16,114.65
1981
68,036.21
45,265.00
4,635.46
* 13,135.75
During the years at issue, petitioner's scrap metal business was primarily a cash business. He maintained no checking account and issued no checks for purchases. Petitioner is unable to substantiate his cost of goods sold for each of the years at issue because he kept no records of those expenses. The difference between the adjusted *488 gross income petitioner reported for each of the years at issue and the net profit petitioner reported from his scrap metal business represents interest income. Petitioner reported the following amounts of interest income in the years at issue: Net Interest
Year
Income
1978 $ 9,339.00
1979
12,827.48  1980
27,625.00  1981
45,261.00  Petitioner received no nontaxable income, receipts, cash, or other assets during the years at issue. The amount of gross income that petitioner stated in his returns for 1978 and 1980 was as follows: Scrap Metal
Interest
Business
Total
1978
$ 9,339.00
$ 69,047.84
$ 78,386.84
1980
27,625.00
65,442.83
93,067.83
Each of petitioner's Federal income tax returns for the taxable years 1978 through 1980 was prepared by a tax return preparer. The only records petitioner submitted to the preparer were summary sheets prepared by petitioner reflecting petitioner's income and expenses. Respondent's Audit
Respondent audited petitioner's Federal income tax returns for the years at issue. Marion Petty, one of respondent's revenue agents, met with petitioner in April 1982. During *489 the meeting, Petty asked petitioner how much cash he maintained on hand. Petitioner responded that he kept between $ 4,000 and $ 5,000 on hand, which he used for business purposes. Petitioner denied having inherited anything from his parents, and stated that he had received a total of only $ 2,000 of insurance when they died. When Petty next spoke with petitioner on May 11, 1982, Petty told petitioner that it appeared that the increase in his savings and certificates of deposit during the years at issue was much greater than the income he had reported. Petitioner then explained that he had between $ 30,000 and $ 40,000 of cash that he had saved during the 1960's on hand at the beginning of 1978 and that he had deposited the cash during the years 1978 through 1981. Petitioner elaborated upon his story when he spoke with Terence J. O'Brien, one of respondent's special agents, on July 26, 1982. At that interview, petitioner estimated that he had approximately $ 60,000 to $ 70,000 in savings at his home in 1973 when he purchased his first certificate of deposit. He explained that he never counted the cash, and that it would have amounted to as much as $ 100,000. When asked *490 by O'Brien to substantiate the expenses he claimed on his returns, petitioner furnished O'Brien with receipts for repairs. He told O'Brien that although he had maintained records substantiating the other expenses he claimed, he was unable to locate the records. As petitioner was unable to supply respondent with the documentation he needed to complete his audit, respondent was forced to recompute petitioner's income for the years at issue using the net worth and personal expenditures methods of income reconstruction. [4] Using the net worth and personal expenditures method, respondent determined that petitioner had received the following amounts of unreported net income during the years at issue: Year
Net Income
1978
$ 24,667.45
1979
8,704.16
1980
32,578.16
1981
14,189.36
Total    $ 80,139.13
*491 Respondent determined that the unreported income was profit from petitioner's scrap metal business. In arriving at his determination of petitioner's unreported income, respondent determined that petitioner had on hand the following amounts of cash and undeposited checks: Amount on Hand December 31
Asset
1977
1978
1979
1980
1981
Operating
Cash  $ 5,300.00
$ 5,300.00
$ 5,300.00
$ 5,300.00
$ 5,300.00
Other Cash
15,394.65
29,565.56
895.45
-
975.00
Undeposited
Checks  -
2,391.24
40,240.74
-
1,100.00
$ 20,694.65
$ 37,256.80
$ 46,436.19
$ 5,300.00
$ 7,375.00
Respondent issued petitioner a statutory notice of deficiency reflecting the above determinations on March 29, 1985. OPINION Introduction
As a general rule, petitioners have the burden of disproving deficiencies determined by respondent in a notice of deficiency, Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Respondent correspondingly has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). In this case, however, assessment of the deficiencies for 1978, 1979, and *492 1980 is barred by the three-year statute of limitations of section 6501(a) unless respondent demonstrates that an exception applies. [5] To establish an exception, respondent must either prove by a preponderance of the evidence that the omitted income for each of the years exceeds 25 percent of the gross income petitioner reported, or prove by clear and convincing evidence that the return for each of the years was "false or fraudulent with the intent to evade tax." Sec. 6501(c)(1); sec. 6501(e)(1)(A). See Bonelli v. Commissioner,T.C. Memo. 1965-26. Deficiency
Respondent is entitled to reconstruct petitioner's income by using the net worth plus personal expenditures method, as petitioner maintained no records to substantiate the bulk of the expenses he claimed on his returns. Holland v. United States,348 U.S. 121 (1954); Thomas v. Commissioner,223 F.2d 83, 86 (6th Cir. 1955). *493 Petitioner did not contest respondent's entitlement to use the net worth plus personal expenditures method, and stipulated to all but two aspects of respondent's determination of his income: (1) His cash on hand on December 31, 1977, and (2) the amount of certificates of deposit he owned on December 31, 1977. The two errors asserted by petitioner bear upon the increase in net worth determined by respondent. Petitioner asserts that respondent's determinations overstated the increase in his net worth during the years at issue because they excluded a cash hoard he allegedly had on hand at the end of 1977 and because they understated the amount of the certificates of deposit he owned at the end of 1977. According to petitioner, he used cash he withdrew from the hoard and the proceeds of maturing certificates of deposit to purchase assets that were included in respondent's net worth determination. Certificates of Deposit - Respondent's net worth computation includes $ 64,000 of certificates of deposit in petitioner's net worth as of December 31, 1977. Petitioner contends that he owned $ 88,000 of certificates of deposit on that date. Petitioner offered no evidence, and did *494 not testify, that he held any certificates of deposit at December 31, 1977 other than the $ 64,000 of certificates allowed by respondent. Respondent established that petitioner had only $ 64,000 of certificates of deposit on December 31, 1977 by calling as witnesses a current employee and a former employee of Raleigh Federal Savings and Loan ("Raleigh Federal"), the institution with which petitioner dealt in that period. Both testified that they thoroughly reviewed Raleigh Federal's records and that the records disclosed that, on December 31, 1977, petitioner held only the $ 64,000 of certificates of deposit that respondent allowed in the net worth computation. We conclude that respondent has proven that petitioner had on December 31, 1977, only the $ 64,000 of certificates of deposit included in the net worth computation. Cash on Hand - Petitioner asserts that he had a cash hoard on December 31, 1977, of between $ 45,000 and $ 100,000, and that he used the cash to purchase certificates of deposit during the years at issue. Respondent established the amount of cash petitioner had on hand by the testimony of Henry Harmon, a certified public accountant employed by respondent *495 as a revenue agent. Harmon testified how he computed petitioner's cash on hand and that he computed that petitioner had $ 20,694.65 of cash on hand as of December 31, 1977. Respondent allowed petitioner that amount of cash on hand in his notice of deficiency. The only support for petitioner's contention that he had more cash on hand than was allowed by respondent was petitioner's own testimony. [6] We note at the outset that we are not required to accept testimony at face value, nor that which we consider to be inherently improbable. Urban Redevelopment Corp. v. Commissioner,294 F.2d 328, 332 (4th Cir. 1961), affg. 34 T.C. 845 (1960); Archer v. Commissioner,227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court. We found petitioner's testimony that he had more cash on hand than was allowed by respondent unpersuasive and inherently improbable. First, petitioner's testimony regarding the amount of cash he had on hand as of December 31, 1977 was vague and imprecise. Petitioner was unsure exactly how much he had and testified that he "really didn't count the cash, but [he] kept it." *496 Second, inconsistencies in petitioner's testimony lead us to conclude that it is inherently improbable that he had more cash on hand than was allowed by respondent. Petitioner conceded that he took out a number of loans during the years at issue, some of which were for only $ 5,300. Petitioner's borrowing of money indicates the absence, rather than the presence, of a large accumulation of cash. Thomas v. Commissioner, supra at 88. Petitioner's explanation for borrowing the money rather than withdrawing cash from his hoard -- that it was easier for him to obtain a loan than to remove the cash -- was difficult for us to believe. The explanation is curious in light of petitioner's testimony that he removed cash from the hoard on numerous occasions during the years at issue to purchase certificates of deposit. Petitioner's position that he had a larger cash hoard than respondent allowed also conflicts with his testimony that he invested his funds to earn the highest yields available. He testified that he cashed savings bonds and reinvested the proceeds in certificates of deposit to increase the interest rate being earned on the funds, and that he deposited *497 funds from maturing certificates of deposit into a passbook savings account during 1976 and 1977 until he had accumulated the $ 100,000 he needed "to get a pretty good rate." Petitioner's assertion that he maintained a large cash hoard on which he received no interest is inconsistent with his testimony that he attempted to maximize his interest income. The fact that he accumulated funds in a savings account in 1976 and 1977 until he had enough to purchase a high yielding certificate of deposit indicates further that he did not have a larger amount of cash on hand outside of banks at the end of 1977 than respondent allowed. Petitioner could point to no good reason for keeping a large amount of cash on hand. His testimony that he kept cash because "maybe I needed a truck or something or maybe I wanted to buy another house or something" was unpersuasive, particularly considering the admitted ease with which he could borrow money. We conclude that a preponderance of the evidence establishes that petitioner had no more cash on hand at December 31, 1977, than was allowed by respondent. Although respondent's statutory notice and the net worth computations contained therein are not *498 evidence in the first instance, Rockwell v. Commissioner,512 F.2d 882, 885 (9th Cir. 1975), cert. denied 423 U.S. 1015 (1975), where items in the net worth statement have been admitted, stipulated or proved, they become evidence of petitioner's income during the years at issue. See Hoffman v. Commissioner,298 F.2d 784, 786 (3d Cir. 1962), affg. on this issue T.C. Memo. 1960-160; Archer v. Commissioner, supra at 272. Petitioner has stipulated to all but two aspects of the net worth computations, and we have concluded that respondent has proven by a preponderance of the evidence that his version of those two aspects is correct. We accordingly hold that respondent has proven by a preponderance of the evidence that petitioner received during the years at issue the unreported net income determined in the notice of deficiency. [7]
Fraud
Having concluded that the preponderance of the evidence establishes that petitioner *499 received the unreported income determined by respondent, we must next decide whether petitioner is liable for the addition to tax for fraud provided by section 6653(b). To establish fraud, respondent must show that the taxpayer intended to evade taxes known or believed to be owing by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Rowlee v. Commissioner; supra; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed, but rather must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Respondent may carry his burden on the basis of reasonable inference to be drawn from the record, but he may not rely on petitioner's failure to carry his burden of proof as to the underlying deficiency. Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982). Moreover, as to the year in suit, respondent need only *500 prove that "any part of any underpayment * * * is due to fraud." Sec. 6653(b)(1); Estate of Beck v. Commissioner,56 T.C. 297, 362 (1971). Direct proof of the taxpayer's intent is rarely available; therefore, fraud may be proved by circumstantial evidence. Spies v. United States,317 U.S. 492, 499 (1943); Rowlee v. Commissioner; supra at 1123. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,55 T.C. 213, 224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). The burden is on respondent to prove, by clear and convincing evidence, that petitioner has an underpayment for each of the years at issue, and that some part of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b); Stone v. Commissioner, supra at 220. Respondent need not, however, prove civil fraud "beyond a reasonable doubt." Webb v. Commissioner,394 F.2d 366, 380 (5th Cir. 1968), affg. T.C. Memo. 1966-81. After considering and accounting due weight to all the evidence before us, we conclude that respondent has failed to meet *501 his burden of proving by clear and convincing evidence that petitioner is liable for the addition to tax for fraud. First, we do not believe that the evidence clearly and convincingly establishes deficiencies in the years at issue. Although we sustained the underreporting of income determined by respondent, we did so on the grounds that his determination is supported by a preponderance of the evidence. We do not view the evidence as clearly and convincingly refuting petitioner's contention that the apparent increases in his net worth were due to withdrawals from the cash hoard. Although we consider it unlikely, the circumstances of this case leave us unconvinced that it did not occur. The evidence of petitioner's family's history of maintaining its savings in cash, and respondent's own determination that petitioner retained on hand relatively large sums of cash and bank checks for which he had no apparent need, leads us to believe that petitioner's hoard may in fact have been larger than respondent determined, which is petitioner's position. Apart from the fact that the record does not clearly and convincingly establish deficiencies in the years at issue, we do *502 not view petitioner's behavior as establishing a fraudulent intent. The testimony of respondent's agents establishes that petitioner was cooperative, and that he met with them on many occasions to answer their questions and produce for them records that were available to him. Respondent argues on brief that petitioner made inconsistent statements concerning his alleged cash hoard, and that those inconsistent statements indicate a fraudulent intent. We do not view petitioner's statements concerning his claimed cash hoard to necessarily be inconsistent. The statements that respondent alleges to be inconsistent appear to us to address the size and location of his hoard at different times. Statements indicating that the size of his hoard decreased over time are entirely consistent with petitioner's testimony that he made periodic withdrawals from the hoard. Another argument that respondent makes on brief to support his determination that petitioner's understatements are due to fraud is that petitioner had Tony Cannon, petitioner's uncle, testify falsely at trial in an attempt to mislead this Court. Respondent asserts that Cannon's allegedly inconsistent statements "represent petitioner's *503 bungled attempt to mislead respondent and this Court * * *." Although we agree with respondent that Cannon's testimony was confusing on the point of whether he had actually seen petitioner place cash in petitioner's washing machine, Cannon testified clearly that (1) he had seen petitioner's cash, (2) he did not know how much cash petitioner had, and (3) he never actually saw cash in petitioner's washing machine. In these circumstances, we are unable to conclude that Cannon's confusion established either that he testified falsely or, more importantly, that petitioner knowingly used his false testimony to mislead this Court. In short, we are unable to conclude that petitioner's behavior establishes a fraudulent intent. Statute of Limitations
Having concluded that petitioner received the unreported income determined by respondent, but that respondent failed to prove that petitioner is liable for the addition to tax for fraud, we must next determine whether the statute of limitations bars the assessment and collection of the deficiencies for 1978, 1979, and 1980. [8] As we have discussed supra, the three year statute of limitations of section 6501(a) bars the assessment and *504 collection of the deficiencies unless an exception applies. The two exceptions that respondent argues apply are: (1) the exception provided by section 6501(c)(1), and (2) the exception provided by section 6501(e)(1)(A). Section 6501(c)(1) - Respondent's primary position is that the statute of limitations is open for 1978, 1979, and 1980 due to the exception provided by section 6501(c)(1). Section 6501(c)(1) provides, in relevant part, that in the case of the filing of "a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time." The burden that respondent bears of proving the applicability of the section 6501(c)(1) exception to the general three-year statute of limitations is the same burden as that which respondent bears in sustaining the addition to tax for fraud under section 6653(b). Ruidoso Racing Association, Inc. v. Commissioner,476 F.2d 502, 505, 507 (10th Cir. 1973), affg. T.C. Memo. 1971-194; Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 232 (3d Cir. 1967), revg. 46 T.C. 622 (1966). *505 As we have already held that respondent failed to sustain the addition to tax for fraud under section 6653(b), we hold that respondent has similarly failed to establish that the exception provided by section 6501(c)(1) to the normal three year statute of limitations applies. Section 6501(e)(1)(A) - Respondent's alternate position is that the statute of limitations is open for 1978 and 1980 due to the exception provided by section 6501(e)(1)(A)). [9] Section 6501(e)(1)(A) provides, in relevant part, that if a "taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed * * * at any time within 6 years after the return was filed." Section 6501(e)(1)(A)(i) provides further that the gross income of a trade or business is 'the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales in services * * *." We have found as a fact that *506 petitioner reported, and upheld respondent's determination that he failed to report, the following amounts of income: Unreported
Reported
Year
Net Income
Gross Income
1978
$ 24,667.45
$ 78,386.84
1980
32,578.16
93,067.83  The amounts of unreported net income for both 1978 and 1980 exceed 25 percent of the gross income stated in the returns. To establish that the six-year statute of limitations provided by section 6501(e)(1)(A) applies for both years, respondent must prove that the unreported net income results from omitted gross income rather than excessive deductions. Courtney v. Commissioner,28 T.C. 658, 668-669 (1957). Respondent has offered no such proof. Respondent introduced no evidence that petitioner's unreported net income, which he determined was from petitioner's scrap metal business, is due to unreported gross sales of the business. The little evidence of the source of the unreported income contained in the record indicates that it is due to overstated costs of goods sold and business expenses rather than understated gross sales. Respondent's agents Petty and O'Brien testified at trial that petitioner produced *507 records of his sales that tied in very closely with the sales he reported on his returns. They testified, however, that petitioner failed to produce any records substantiating the deductions he claimed for scrap purchases. We accordingly conclude that respondent has failed to prove that the exception provided by section 6501(e)(1)(A) to the normal three-year statute of limitations applies to 1978 and 1980. As we have concluded that respondent has failed to prove that either section 6501(c)(1) or section 6501(e)(1)(A) applies to extend the normal three-year statute of limitations for 1978, 1979, and 1980, we hold that respondent is barred from assessing and collecting deficiencies for those years. As to the year 1981, respondent's determination of deficiency only is approved. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
2. Petitioner's father had only one leg, and his mother had diabetes. Petitioner's only sibling, an older brother, drowned in 1947. ↩
3. Petitioner apparently has never married, and has no other family. ↩
*. These amounts were rounded to the nearest dollar when they were carried forward from Schedule C's and reported on petitioner's 1040 Forms. ↩
4. Under the net worth method, a taxpayer's income is determined to be the amount by which his year-end net worth exceeds his net worth at the beginning of the year. The result is then reduced by the part of the increase in net worth that is due to nontaxable sources, and is increased by nondeductible personal expenses. United States v. Giacalone,574 F.2d 328, 330 (6th Cir. 1978), cert. denied 439 U.S. 834↩ (1978). 5. As each of petitioner's returns was timely filed, the normal three year statute of limitations for the assessment of the deficiencies for 1978, 1979, and 1980 expired on April 15 of 1982, 1983, and 1984, respectively. Sec. 6501(a). The statutory notice of deficiency was not mailed until March 29, 1985. ↩
6. Although Tony Cannon, petitioner's uncle, testified that he had seen petitioner hide cash, he testified that he never knew how much cash petitioner had. ↩
7. As we have already noted, respondent bears this burden solely for purposes of the extended period of limitations under sec. 6501(e)(1)(A), and for the years 1978, 1979 and 1980. ↩
8. No issue is raised concerning the statute of limitations for 1981. ↩
9. Respondent does not contend that the statute of limitations is open for 1979 under sec. 6501(e)(1)(A). ↩