WILLIAM W. JONES AND PRISCILLA A. JONES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jones v. Commissioner
Docket No. 20418-90
United States Tax Court
T.C. Memo 1994-230; 1994 Tax Ct. Memo LEXIS 232; 67 T.C.M. (CCH) 2997; May 24, 1994, Filed *232 William W. Jones and Priscilla A. Jones, pro sese. For respondent: Frank C. McClanahan III and Paul G. Topolka. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax and self-employment tax: Additions to Tax
Year
Deficiency
Sec. 6653(b) [1] Sec. 6661 1981
$ 31,019
$ 15,510
N/A  1982
87,718
43,859
$ 21,930
1983
73,480
36,740
18,370
1984
8,330
4,165
2,083
1985
18,496
9,248
4,624
1986
20,272
15,204
5,068
1987
174,403
130,803
43,601
1988
10,945
8,209
2,736
Unless otherwise indicated, all section references are *233 to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Petitioners, William W. and Priscilla A. Jones, were husband and wife during the years in issue. When they filed their petition herein, they resided in Summerfield, North Carolina. The issues presented are: (1) Whether petitioners had unreported income for their taxable years 1981 through 1988; (2) whether petitioners made understatements of income as a result of fraud for the years 1981 through 1988; (3) whether petitioner William W. Jones is subject to self-employment tax for his taxable years 1982 through 1988; and (4) whether petitioners are subject to the additions to tax for substantial understatements of income tax. FINDINGS OF FACT Background
Petitioner Mr. William W. Jones (Mr. Jones) advises that he is very knowledgeable in the areas of finance, accounting, and tax law. He claims to have passed the Certified Public Accountant's examination before graduating from Penn State University with a degree in accounting. Mr. Jones represents that one of his "special skills" is minimizing taxes, especially through net operating *234 loss carry-forwards. In the early 1970's, Mr. Jones began working for an organization known as the W.H. Furniture Group, Inc. In 1978, Mr. Jones began work for Williams Hudson U.S.A., Inc., a subsidiary of Williams Hudson Group, Ltd. Mr. Jones' assignment was to locate businesses for acquisition by Williams Hudson U.S.A., make the acquisitions, and oversee operations of the companies acquired. Mr. Jones examined 100 to 200 companies per month and engaged in serious takeover negotiations with 4 or 5 companies per year. One of the companies acquired by Williams Hudson U.S.A. was Home Flinchum Oil and Gas located in Mt.Airy, North Carolina. Petitioners moved to North Carolina from Rhode Island in 1978, and they purchased some 67 acres of land near Summerfield. They named the site "Reata". In fulfillment of a lifelong ambition, Mrs. Jones operated a horse farm on the property. Petitioners financed the acquisition of Reata, the improvements thereon, and some of its operations through loans from the Federal Land Bank and the Production Credit Association (FLB/PCA). [1] They established a familiar relationship with officers of FLB/PCA, who referred to petitioners by their nicknames, *235 "Bill" and "Penny". Petitioners' improvements to Reata included a newly constructed personal residence, consisting of a 4,000-square-foot house, with five bedrooms, four baths, and a kidney-shaped swimming pool. In 1979, Mr. Jones acquired for Williams Hudson U.S.A. a specialty fiberglass manufacturer, Carolina Narrow Fabric, located in Winston-Salem, North Carolina. In 1980 and 1981, Williams Hudson U.S.A. acquired a Texas concern named MARSCO and related companies. At the time of their acquisition, the MARSCO companies were engaged in the development of a methanol refinery. Mr. Jones' acquisitions were not successful. As Horace Lee Freeman, the president of Carolina Narrow Fabric, explained: "Within a few days after the acquisition of the company, all of the monies that Carolina Narrow Fabric had were really dispensed by the parent company, and we went from a corporation that had cash to operate *236 on to a corporation that had a very heavy debt." Carolina Narrow Fabric was resold to Mr. Freeman in 1981. Home Flinchum Oil and Gas was sold in pieces, the last sale closing late in 1981. MARSCO went into liquidation proceedings under the provisions of chapter 7 of the Bankruptcy Code late in 1981. In connection with the bankruptcy proceedings, the methanol refinery was sold for $ 3.5 million in August of 1982. 1981
During their taxable year 1981, petitioners received $ 100,000 from the Williams Hudson Group, Ltd. Mr. Jones received no regular salary check; instead he was paid in different ways, such as receiving wire transfers or the payments on third-party notes. In a financial statement supplied to the Federal Land Bank, petitioners claimed income and bonus payments from Williams Hudson Group, Ltd., during 1981 of $ 200,000. To another lender, petitioners submitted copies of the first page of a 1981 Federal Form 1040 showing a salary of $ 150,000 and an adjusted gross income totaling $ 207,617. Petitioners exaggerated the amount of Mr. Jones' salary to the extent that such amounts exceeded $ 100,000, apparently to make themselves look like good candidates for credit. *237 Petitioners timely filed a joint Federal income tax return (Form 1040) for their taxable year 1981. The filed version differed significantly from that given to the lender. In the filed version, they reported income of $ 37,500 from Carolina Narrow Fabric, plus net farm losses of $ 69,351, for an aggregate overall loss of $ 31,851. They failed to report $ 62,500 received by Mr. Jones as a result of his work for the Williams Hudson entities. [2]
1982
During 1982 petitioners received another $ 100,000 from the Williams Hudson Group, Ltd. In July of 1982, they filed financial statements showing $ 200,000 in combined salary and bonuses projected for 1982. They also provided a letter purportedly from David J. Rowland, the Chairman of Williams Hudson Group, Ltd., indicating that Williams Hudson was paying Mr. Jones $ 150,000 plus *238 a discretionary bonus. In the next year, petitioners provided to First Union National Bank of North Carolina a copy of a 1982 Form 1040 reflecting salary and business income of $ 156,356. Petitioners, however, did not receive income in excess of $ 100,000 from Williams Hudson Group, Ltd., during 1982. During 1982 Mr. Jones was involved in a dispute with Williams Hudson Group, Ltd., and its owner, Mr. Rowland, involving his salary or fees. Mr. Jones obtained some of the assets of Williams Hudson U.S.A. These assets included the ability to receive note payments from the sale of an apartment building in Staten Island, New York (the Nichols note), as well as note payments from C&W Texaco, part of the assets of Home Flinchum Oil and Gas. Mr. Jones also arranged for the transfer to North Carolina of a large amount of cash. That cash had been paid to Williams Hudson U.S.A. in settlement of a note executed by an entity called Pegasus Design Group, Ltd. Mr. Jones and another individual then instituted a lawsuit against the Williams Hudson Group, Ltd., in the General Court of Justice, Superior Court Division, Guilford County, North Carolina. In a default judgment obtained as a result *239 of that lawsuit, Mr. Jones acquired $ 50,000 of the Pegasus Design Group fund. In 1982, petitioners received another $ 11,162 in the form of payments on notes that had been transferred to Mr. Jones as payment by the Williams Hudson Group, Ltd. In the summer of 1982, petitioners listed 6,000 shares in Simplicity Patterns, a publicly traded corporation, as security for loans from FLB/PCA, in connection with petitioners' financing some horses. Officials of FLB/PCA later discovered that the certificate had been altered, and that petitioners really owned only 100 shares. Petitioners did not file a timely Federal income tax return for 1982. In October of 1987, however, they filed a 1982 return with one of respondent's agents. In the case of the 1982 return, petitioners' signature lines bore both a purportedly timely filing date -- April 12, 1983 -- and the date of October 5, 1987, when petitioners provided the return to Revenue Officer Cecelia Pelt. On the return, petitioners indicated that they had no income from wages or salary. They thus did not report the $ 100,000 received from the Williams Hudson entities in the form of fees, note payments, or the default judgment. They reported *240 interest income of $ 703, however, and, as "other income", "Grand Jury $ 120 IRA's Hartford (2253) and Corp Life (3570)". They claimed some $ 90,818 of net farm losses. Both listed their occupations as "farmer". In 1982 and continuing into 1983, Mr. Jones used an alter ego company named RWK Superior Productions to handle some of his finances. For example, he used RWK Superior Productions to invoice collections on the C&W Texaco note. 1983
In 1983, petitioners received another $ 61,600 with respect to Mr. Jones' involvement with the Williams Hudson Group, Ltd., and/or Williams Hudson U.S.A. Some $ 31,600 of this amount came in the form of payments on the installment notes acquired by Mr. Jones. In an income and expenditures statement for the 12-month period ended October 31, 1983, petitioners also reported receiving $ 30,000 as 3 months' salary from Williams Hudson. Petitioners' receipt of income from the Williams Hudson Group, Ltd., or its related entities ended sometime in 1983. During 1983, Mr. Jones also received income from operating an income tax service, known as Computer Tax Service, at the local Montgomery Ward & Co. store. Petitioners did not file a timely *241 Federal income tax return for their 1983 taxable year. In October of 1987, however, they filed a 1983 return with one of respondent's agents. On their return for 1983, Mr. Jones indicated a question mark for the filing date; he and his wife both added "10/5/87" in the signature box. They reported no wage or salary income, thus omitting the $ 61,600 received in note payments and consulting fees with respect to the Williams Hudson entities for that year. They did, however, list $ 65 as interest income and net farm losses of $ 85,871. Both Mr. and Mrs. Jones again listed their occupations as "farmer". Petitioners prepared a 1983 Schedule F, which is designed for the reporting of farm income and expense. Under the heading "Sales of Livestock and Produce You Raised and Other Farm Income", petitioners indicated "Income Tax 5262". Under "Farm Deductions", they listed "Expense Income tax 3293". These entries apparently referred to income received, and expenses incurred, with respect to Mr. Jones' income tax service at Montgomery Ward & Co. 1984
In 1984, Mr. Jones became involved with new sources of income. During that year, petitioners received net payments of $ 81,560 from *242 three related entities -- Viola Sportswear, Society Brands, Inc., and Mens Sportswear, Inc., which is a subsidiary of Society Brands. Early in 1984, Mr. Jones closed the last of his bank accounts in his name. His wife, however, maintained a separate account. During 1984, Mr. Jones again received income from operating the Computer Tax Service at the local Montgomery Ward & Co. store. Petitioners filed an untimely Federal income tax return for 1984 in October of 1987. Petitioners' 1984 return indicated no wage or salary income. It did list interest income of $ 76 and net farm losses of $ 94,854. Petitioners indicated a filing date of "4/10/85"; again adding the dates of "10/5/87". They did not report net income of $ 81,560 from the three related entities -- Viola Sportswear, Society Brands, Inc., and Mens Sportswear, Inc. On their schedule F for 1984, under the heading "Sales of Livestock and Produce You Raised and Other Farm Income", petitioners indicated "Income Tax 4673". Under "Farm Deductions", they listed "Income tax Exp 1582". These entries again apparently referred to income received and expenses incurred with respect to Mr. Jones' income tax service at Montgomery *243 Ward & Co. Both Mr. and Mrs. Jones again indicated their occupation as "farmer". 1985
During 1985, Mr. and Mrs. Jones received unreported income (net of expenses) from Society Brands, Inc., in the amount of $ 105,380 and from Viola Sportswear in the amount of $ 900. Additionally, in 1985, Mr. Jones began receiving income from two additional entities: (1) $ 6,750 from W.T. Rawleigh Co., a sales organization in New Zealand, and (2) $ 5,000 from Timeless Apparel, a manufacturer of blue jeans. Petitioners did not file a timely Federal income tax return for their taxable year 1985. As with the 2 previous years, they did not file a return until October 1987. When filed, their 1985 return again indicated no wage or salary income. They did not report income totaling $ 118,030 from Society Brands, Viola Sportswear, W.T. Rawleigh, and Timeless Apparel. They did report interest income of $ 240 and net farm losses of $ 83,875. The filing date of the return was given as "4/1/86", but petitioners again added the date of 10/5/87. Both again listed their occupations as "farmer". 1986
Petitioners received unreported net income in 1986 of $ 49,845 from W.T. Rawleigh and $ 15,728 *244 from Timeless Apparel. In July of 1986, Timeless Apparel went into bankruptcy. Petitioners did not file a timely Federal income tax return for 1986. On October 8, 1987, petitioners filed their Federal Form 1040 for the year 1986. On that return, petitioners did not report income of $ 49,845 from W.T. Rawleigh and $ 15,728 from Timeless Apparel. They reported $ 228 in interest income and net farm losses of $ 49,411. 1987
During 1987, petitioners received unreported income, net of expenses, from W.T. Rawleigh, in the amount of $ 15,391. During 1987, Mr. Jones also went to work for W.M. Babcock, who owned a company called Traxion Studios. Mr. Jones told Mr. Babcock of his skill in reducing or eliminating tax liability, and his wish to work as a consultant rather than as an employee because "he didn't want to pay taxes on it." Mr. Jones worked for Mr. Babcock as comptroller for Traxion for the last 6 months of 1987 and the first 2 months of 1988. While he was employed there, Mr. Jones received a fee of $ 24,000. Mr. Jones embezzled another $ 70,000 and stole or destroyed the records that would prove his defalcation. Petitioners received some $ 79,000 in combined embezzlement *245 proceeds and fees from Mr. Babcock or his businesses during 1987. They did not file their Federal income tax return for 1987 until July of 1989. On their tax return for 1987, they reported $ 37,541 of miscellaneous income. This amount is $ 56,850 less than the total of their net income -- $ 15,391 from W.T. Rawleigh plus $ 79,000 in consulting fees and embezzlement income from Babcock/Traxion. They also claimed net farm losses of $ 49,795. In the case of delinquent taxpayers, the normal practice of the Internal Revenue Service was to attempt to contact them by writing four times, then to refer the matter to an office whose responsibility was to attempt to contact the delinquent taxpayers by telephone at night or on weekends. If these methods were unavailing, then a revenue officer would attempt to make personal contact with the taxpayers. In September of 1987, petitioners executed a "North Carolina Deed of Trust" upon their home and farm at Reata in favor of their son Troy. In the trust instrument, they falsely recited that they were indebted to their son in the amount of $ 978,000, and that they were securing that indebtedness with the deed of trust in his favor. Also in *246 September of 1987, Revenue Officer Cecelia Pelt contacted petitioners about their failure to file tax returns after the 1981 tax year. When Mr. Jones talked to Revenue Officer Pelt, he falsely informed her that he had indeed filed the returns. The next month, petitioners filed with Ms. Pelt copies of their Forms 1040 for the years 1982 through 1985. Later that month, they also filed their Form 1040 for their 1986 tax year. Revenue Officer Pelt referred the case to respondent's Criminal Investigation Division (CID). Special Agent Williams of the CID contacted Mr. Jones in January of 1988 about his unfiled tax returns, and Mr. Jones falsely reported that he had filed such returns. Later that year, CID decided not to refer the case for criminal prosecution to the Justice Department, in part because the amount of unreported taxable income fell below prosecutorial guidelines. 1988
Petitioners received another $ 15,000 in the form of consulting fee and embezzlement proceeds from the Traxion Studios in 1988. Later that year, petitioners divided some of their farm acreage into lots for residential development. On November 29, 1988, Mrs. Jones' sister, Janice Newlove (then *247 Janice Smart), agreed to transfer title in her duplex apartment, located in San Jose, California, to petitioners, in exchange for six of their residential lots in which their basis was $ 85,837. At the time it was transferred to petitioners, the duplex was subject to an executory contract of sale. Armed with a power of attorney from Mrs. Jones, Ms. Smart sold the duplex on behalf of petitioners on December 13, 1988. Petitioners received a gain, net of a second mortgage, of $ 140,790 on that transaction. [3]
*248 On July 10, 1989, petitioners mailed their Federal income tax return for 1988. On their tax return for 1988, petitioners did not report any of the $ 15,000 income from Traxion Studios. They reported a gain of only $ 37,724 on the sale of the duplex. They reported farm profit of $ 1,500 and listed their occupations as "developer". Subsequent Events
In a document recorded on July 12, 1989, petitioners transferred title in the six residential lots to Mrs. Newlove. In a document recorded the next day, Troy E. Jones, petitioners' son, wrote "paid in full as of July 10, 1989" on the $ 978,000 Deed of Trust in his favor. Mr. Jones then conveyed his entire interest in Reata to his wife. Mr. Jones had been spending a great deal of time in New Zealand, and was contemplating relocating there. In 1990, Mr. Jones, operating through another company named Reata International, Inc., directed W.T. Rawleigh to pay money to Priscilla Jones directly by wire transfer from New Zealand. Respondent's agents learned that Mr. Jones was removing property from his name. In April of 1990, respondent issued a jeopardy assessment against petitioners, setting forth reasons that an immediate assessment *249 of taxes was justified under the provisions of the Internal Revenue Code. Thereafter, Mr. Jones directed the W.T. Rawleigh money to be sent to his sons. Following a 3-day hearing in January of 1991, the United States District Court for the Middle District of North Carolina issued an order sustaining respondent's jeopardy assessment. Jones v. United States, Nos. 2:90-CV-331 and 357 (M.D.N.C., Feb. 15, 1991). In August of 1992, Mr. Jones was tried and convicted of embezzlement relating to amounts taken from Mr. Babcock or Mr. Babcock's businesses. Mr. Jones has appealed the judgment of conviction, and his appeal was pending at the time of trial in the instant case. At the trial of this matter in 1993, respondent revised and considerably lowered the amounts of alleged unreported income. After making such concessions, respondent asserted that petitioners had unreported income in the amounts of $ 62,500, $ 100,000, $ 100,000, $ 81,560, $ 118,030, $ 65,573, $ 94,391, and $ 122,639, respectively, for the taxable years 1981, 1982, 1983, 1984, 1985, 1986, 1987, and 1988. On the witness stand, Mr. Babcock made a writing exemplar in the presence of the Court to support his claim *250 that Mr. Jones had tried to introduce documents containing Mr. Babcock's forged signature at his criminal trial for embezzlement. Mr. Babcock's handwriting was markedly different from his purported signature on the proffered documents. Despite Mr. Babcock's testimony, Mr. Jones then attempted to introduce, before this Court, a document bearing Mr. Babcock's forged signature in an attempt to show that Mr. Babcock had authorized Mr. Jones' withdrawal of the embezzled funds. OPINION The primary issue for our consideration is whether petitioners had unreported income in the amounts determined by respondent for the years at issue. Respondent has identified a number of specific items that she asserts were taxable income. Petitioners contend they owe no income taxes for the years at issue because of various uncontested losses. Petitioners make many procedural arguments in presenting their case. In view of these arguments, it is appropriate to set forth, in some detail, the procedural framework in which we address the issues presented. Procedural Issues
The Commissioner's determination in a notice of deficiency is generally entitled to a presumption of correctness. This presumption *251 places upon the taxpayers both the burden of proof and the burden of going forward with evidence to establish the correct amounts of their income. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). We will not ordinarily look behind a notice of deficiency to examine the sufficiency of the evidence upon which the Commissioner has based her determination, even though the Commissioner's determination may be based on hearsay. Shriver v. Commissioner, 85 T.C. 1, 3 (1985), affd. without published opinion (7th Cir. 1986); Rosano v. Commissioner, 46 T.C. 681, 687 (1966). Nor will we ordinarily look behind a notice of deficiency to examine the Commissioner's motives or the administrative policy or procedure involved in making a determination. Proesel v. Commissioner, 73 T.C. 600, 605 (1979); Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974); Human Engineering Institute v. Commissioner, 61 T.C. 61, 66 (1973). A trial before this Court is a proceeding de novo; our decision as to a taxpayer's *252 tax liability is based upon the merits of the case as set forth in the record before us. Our decision is not based upon any previous record developed at the administrative level. Greenberg's Express, Inc. v. Commissioner, supra at 328. The presumption of correctness that attaches to the Commissioner's notice of deficiency does not disappear because the Commissioner later concedes large amounts of the deficiencies set forth therein. Gobins v. Commissioner, 18 T.C. 1159, 1168-1169 (1952), affd. 217 F.2d 952 (9th Cir. 1954). In this case, petitioners base many of their arguments on claims that respondent has conceded some issue, or that respondent has destroyed records indicating such concessions. To the extent that petitioners allege that respondent has made binding concessions which respondent now seeks to ignore, we find those allegations to be without foundation. Similarly baseless are petitioners' allegations that respondent's agents destroyed records that might have affected our deliberations. The actions or statements of respondent's agents during the administrative phase of this *253 case will not affect our decision, which is based solely on the record developed before this Court. [4]
Petitioners argue that they are required to prove a negative -- that is, that they did not receive the income in issue. They argue that their burden of proof in such instances should be less than it would be if they were only required to establish their right to deductions. We recognize the difficulty of proving a negative, but we do not release them from the burden of proof. Foster v. Commissioner, 391 F.2d 727, 735 (4th Cir. 1968), *254 affg. in part, revg. in part on another issue and remanding T.C. Memo. 1965-246. Petitioners knew what their income was, and they had records, or access to records, to substantiate that income. Respondent had no such first-hand knowledge and had to rely upon circumstantial evidence to determine the amounts of unreported income. Under these circumstances, it is appropriate to place the burden of proof upon petitioners. In a case involving unreported income from an unlawful activity, however, the Commissioner will not be entitled to the presumption of correctness if the taxpayers show that the Commissioner has failed to link the taxpayers with some illegal tax-gathering act. Shriver v. Commissioner, supra; Franklin v. Commissioner, T.C. Memo. 1993-184. In this case, the only unreported income from an illegal activity arises from the embezzlement proceeds discussed below. In that instance, respondent relies upon the testimony of the victim of that embezzlement, as well as petitioner William Jones' conviction of such embezzlement. In so doing, we find that respondent has provided a sufficient *255 link between petitioners and the activity at issue to retain the presumption of correctness. There are, of course, occasions when the burden of proof is imposed upon the Commissioner. One such occasion arises when the Commissioner alleges fraud with intent to evade tax. In such instances, as discussed more fully below, the Commissioner has the burden of proof. See Rule 142(b). Another such occasion arises when the Commissioner seeks to establish "new matter" within the scope of Rule 142(b). We have explained the scope of such "new matter" as follows, Achiro v. Commissioner, 77 T.C. 881, 890 (1981): The assertion of a new theory which merely clarifies or develops the original determination without being inconsistent or increasing the amount of the deficiency is not a new matter requiring the shifting of the burden of proof. * * * However, if the assertion in the amended answer either alters the original deficiency or requires the presentation of different evidence, then respondent has introduced a new matter. * * * Before trial in this case, we identified as "new matters" three issues -- introduction of respondent's "source and application" *256 method, the question of basis in the "Smart" transaction, and respondent's reallocation of certain "Schedule F" losses from one year to another. Respondent has since conceded the last issue. As to the other two issues, respondent has the burden of proof. Although petitioners assert that there are other "new matters", their assertions relate to items that do not fall within the definition of "new matter" as set forth in Achiro. Unreported Income
A taxpayer is required to maintain records sufficient to show whether or not he or she is liable for Federal income taxes. Sec. 6001. Gross income means all income from whatever source derived. Sec. 61. If a taxpayer refuses to cooperate in the ascertainment of income, the Commissioner may use any reasonable means to reconstruct the taxpayer's income. In reconstructing the taxpayer's income, the fact that the Commissioner's reconstruction may not be completely correct does not invalidate the method used. DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Our task in this case has been complicated by the manifest lack of honesty and *257 candor displayed by petitioners -- principally by Mr. Jones, but with the apparent willingness of Mrs. Jones. The record is replete with petitioners' inconsistent representations of the amounts of income they received for any given period, of the identity of Mr. Jones' employment or employers, and of the sources or the amount of his income or losses. We have done our best to sort out these inconsistencies in making our findings herein. With these principles in mind, we examine each of the taxable years before us in order. a. Tax Year 1981
For the year 1981, we find that petitioners earned $ 100,000 from the Williams Hudson Group or associated companies. Our finding is based principally upon the loan application and separate tax return that petitioners submitted to lending institutions. In each, Mr. Jones had indicated the receipt of more than $ 100,000 in salary and bonuses. [5]
*258 Mr. Jones contends that officials of the lending institutions instructed him to inflate his income figures to shore up his acceptability as a potential borrower. We do not believe this. He also argues that the only income he received in 1981 was the payment of $ 37,500 from Carolina Narrow Fabric, as reported in his Federal income tax return for that year. [6]
Petitioners failed to report at least $ 62,500 of income in 1981. We refuse to accept Mr. Jones' explanation that he lied outrageously in his loan documents while *259 telling the truth about his income in his 1981 Federal income tax returns. Although petitioners exaggerated somewhat the amount of their income for 1981 in their loan applications, we think that the income they received was much closer to $ 100,000 than to the $ 37,500 which was reported. Furthermore, during 1981, Mr. Jones controlled business entities other than Carolina Narrow Fabric. All of them soon fell into bad financial health. Mr. Jones testified that he filed claims in bankruptcy for amounts owed to him by the MARSCO subsidiaries. This action shows the possibility that he received income from acquired companies other than Carolina Narrow Fabric alone. Finally, we note that petitioners reported the $ 37,500 from Carolina Narrow Fabric only following an audit by a major accounting firm. [7]
*260 b. Tax Year 1982
For 1982, we have found that petitioners received $ 100,000 from the Williams Hudson Group or associated entities. This is conservative. We base our finding upon financial statements filed by petitioners in 1982, indicating that there would be $ 200,000 in salary and bonuses from Williams Hudson. We also rely upon two income tax returns, prepared by petitioners and submitted to lenders in 1982, indicating $ 154,356 in adjusted gross income for that year. [8] Additionally, petitioners submitted a letter, allegedly from David J. Rowland of the Williams Hudson Group, Ltd., indicating that Mr. Jones would receive $ 150,000, plus a discretionary bonus. We also note that Mr. Jones has conceded receiving $ 11,162 in payments during 1982 upon the C&W Texaco and Nichols notes. Further, we have evidence showing Mr. Jones' receipt of $ 50,000 in a default judgment against Williams Hudson Group, Ltd. *261 Mr. Jones asserts, again, that his loan applications were false and inflated to improve his prospects as a borrower. He further asserts that his draft tax returns were supplied to lenders for the same purpose -- to show that he had substantial income and would be a worthy credit risk. We do not doubt that in 1982, Mr. Jones again exaggerated his income on his financial statements and draft tax returns when he supplied those documents to lenders in support of his loan applications. Mr. Jones has not convinced us, however, that he did not receive at least $ 100,000 in taxable income in 1982. The sources that were available to him in 1981 were still present in 1982. [9]
*262 Mr. Jones concedes that he received income on the C&W Texaco and Nichols notes, but insists that he reported that income before 1982, when, he asserts, he first received those notes, pursuant to section 451. Section 451, however, generally only requires a taxpayer to report income "for the taxable year in which received by the taxpayer". We do not believe that Mr. Jones reported any income based upon these notes, other than any cash he might have received. Additionally, the record reflects that, during 1982, Mr. Jones received and deposited $ 50,000 as a result of his lawsuit in the Guilford County court. [10] The payment took the form of a check for $ 50,000 made out to petitioner's law firm, and endorsed by it to petitioner. The record also shows that Mr. Jones wrote a check for $ 27,900 to R. Carter Pate, his alleged coplaintiff. Mr. Jones claims that this check represented Mr. Pate's share of the recovery, but we are not convinced. The $ 50,000 represents the actual amount of back pay and severance pay that Mr. Jones sought for himself. Moreover, Mr. Jones has not explained why the law firm would require him to pay Mr. Pate's share, if Mr. Pate was entitled to some part *263 of the judgment. Nor have petitioners explained why Mr. Jones would pay Mr. Pate more than half the amount received, when Mr. Pate had sought less than Mr. Jones in the complaint. The check at issue does not bear Mr. Pate's endorsement, [11] nor did petitioners call Mr. Pate to testify. We do not believe that Mr. Jones was above "laundering" the $ 27,900 at issue through Mr. Pate. Mr. Jones' self-serving testimony fails to justify excluding $ 27,900 from his 1982 income. *264 Petitioners also claim that the amount of the default judgment should be reduced to reflect unreimbursed expenses incurred while Mr. Jones was working for Williams Hudson. The expense figure of $ 8,518 is shown as an attachment to his complaint. Absent proof that the amount constituted a valid deduction for 1982, we are not willing to allow Mr. Jones to lower his taxable income by this amount. c. Tax Year 1983
For 1983, we have found that petitioners received another $ 61,600 related to Mr. Jones' involvement with the Williams Hudson Group, Ltd. Of this amount, $ 31,600 came in the form of payments on the installment notes acquired by Mr. Jones. Additionally, we note that, in an income and expenditures statement for the 12-month period ended October 31, 1983, petitioners reported receiving $ 30,000 as 3 months' salary from Williams Hudson. This amount should be added to their unreported $ 61,600 in note payments for 1983. Respondent also urges that in 1983 Mr. Jones received an additional $ 25,000 for engaging on a new project for the owner of Carolina Narrow Fabric. The evidence indicating that Mr. Jones would receive a fee of $ 25,000 from Carolina Narrow Fabric, *265 however, contemplates a position to be filled in the future. Mr. Freeman, the president of that company, later testified that he did not employ Mr. Jones after 1981, and we accept that testimony. In an interview in 1983 with the loan officers of the Federal Land Bank, Mr. Jones reported that he had severed his ties with Williams Hudson in the middle of 1983. Petitioners made regular loan payments to FLB/PCA until March of 1983. They brought their payments current in June of 1983 with income from the notes receivable Mr. Jones had acquired. On this record, we conclude that, by the end of 1983, petitioners received no additional income from the Williams Hudson Group, Ltd., from Williams Hudson, U.S.A., Inc., from David Rowland, or from the companies Mr. Jones acquired under the auspices of Williams Hudson Group, Ltd. Accordingly, we reject respondent's assertion that petitioners received income of $ 100,000 during 1983 with respect to Williams Hudson. The Williams Hudson ventures had soured by that time, and petitioners for the first time fell behind in making payments on Reata. For their part, petitioners argue that Mr. Jones received no income in 1983 from the Williams Hudson *266 Group, Ltd., because it was liquidated on March 1, 1982, and because respondent has no direct evidence of the receipt of any income from the Hudson Group. In documents submitted to lenders, however, petitioners have conceded receiving at least $ 61,600 in salary and note income from Williams Hudson ventures for 1983, and we hold them to those statements. d. Tax Year 1984
For 1984, petitioners failed to report $ 81,560 income from various sources, but petitioners nevertheless incurred a net loss for that year. e. Tax Year 1985
In 1985, respondent asserts that Mr. Jones received a salary or consulting fees of $ 105,380 from Society Brands, Inc., and amounts from other entities totaling $ 12,650. Petitioners generally agree, but contend that the $ 105,380 figure from Society Brands, Inc., includes $ 60,122 in nontaxable expense reimbursements. They insist that respondent's allowance of $ 42,404 of this amount as nontaxable expense reimbursements -- a difference of $ 17,718 -- is too low. Petitioners have not proven their case for 1985. Petitioners point to the testimony of Special Agent Williams, who stated that he had checked with Society Brands, Inc., and had reconciled *267 reimbursable expenses except for approximately $ 10,000 or $ 11,000. That testimony is not helpful. Our decision is based upon the record before us, not hearsay as to events at the administrative level. See Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974). Petitioners must prove that Mr. Jones was entitled to reimbursable expenses in the amount claimed. Rule 142(a). Their principal evidentiary support is a handwritten workpaper, Exhibit 30. Upon it are written some figures that, if applied as Mr. Jones wishes, would serve to increase the amount of expenses allowed. However, Mr. Jones, who has shown himself capable of explaining intricate accounting concepts, failed to do so here. Without more, the entries on the workpaper fail to prove that petitioners are entitled to have their income for 1985 lowered by the amounts of claimed additional expenses. The workpaper fails to establish the nature of the expenses listed or even that such expenditures took place. f. Tax Year 1986
For the taxable year 1986, the parties do not dispute that petitioners received $ 49,845 from W.T. Rawleigh. Respondent initially asserted that *268 petitioners received some $ 35,428 from an entity known as "Timeless Apparel." At trial, however, respondent lowered the asserted amount of unreported income from Timeless Apparel to $ 15,728. Respondent's assertion of this lower amount is based upon a statement found in respondent's files, showing a balance sheet of "Timeless Apparel II". A note to the balance sheet shows that $ 15,728 was the amount of that company's money used by Mr. Jones in 1986 for his own purposes and not repaid. [12]
Not satisfied with respondent's concession of the higher amount, petitioners argue that the Timeless Apparel II balance sheet and its accompanying notes were "hearsay" and were not identified as being *269 the documents upon which respondent based her original notice of deficiency. However, Mr. Jones did not object to the document when it was introduced and did not explain the entry when allowed to do so. [13]
Petitioners *270 additionally claim that between the time they prepared their 1986 return and the time of trial, they discovered that they overstated reported income from operations of the horse farm by some $ 10,457. Petitioners have submitted a schedule and corresponding deposit tickets indicating that the total deposits of income relating to the horse farm were only some $ 30,103 and not the approximately $ 40,560 originally reported. In view of Mr. Jones' expertise and his overall lack of credibility, however, we are far from convinced that the deposit tickets and accompanying schedule reflect all such income in 1986. Accordingly, we decline to lower the amounts of farm income from those he originally reported. g. Tax Year 1987
For 1987, the parties agree that petitioners received $ 15,391 from W.T. Rawleigh. Relying upon Mr. Babcock's testimony, respondent also asserts that Mr. Jones received a salary or consulting fees from Babcock/Traxion of $ 24,000 for the 8-month period of July 1987 through February of 1988. Additionally, Mr. Jones misappropriated some $ 70,000 during his tenure there. Therefore, the total amount from Babcock/Traxion is $ 94,000. Respondent allocated $ 79,000 *271 of these proceeds to the taxable year 1987 and another $ 15,000 to the next year. Petitioners counter that Mr. Babcock and his accountants were in fact able to come up with only $ 31,500 in canceled checks to establish the amount of petitioner's embezzlements. Mr. Babcock testified, however, that $ 70,000 was missing, with no explanation other than petitioner's defalcations. We found Mr. Babcock to be a highly credible witness. Mr. Babcock's assertion is corroborated by a contemporaneous letter from his attorneys to Mr. Jones, demanding payment of $ 75,000 as a condition for dismissing the criminal proceeding. From this evidence, respondent has sufficiently demonstrated that petitioners received $ 70,000 in embezzlement proceeds from Babcock/Traxion in 1987 and 1988. On brief, petitioners renew their arguments that they were surprised by the testimony of Mr. Babcock. At trial, we pointed out that Mr. Babcock had been on respondent's witness list and that he was the principal complainant at Mr. Jones' criminal trial. They have not shown since that they were unfairly prejudiced by Mr. Babcock's testimony. Petitioners' unreported income for 1987 is $ 94,391. Of this amount, *272 petitioners reported some $ 37,541 as "Miscellaneous income" on their 1987 tax return. They are chargeable with failure to report the balance. h. Tax Year 1988
Respondent allocated the remaining $ 15,000 of the $ 94,000 total Babcock/Traxion income to petitioners' 1988 taxable year. Respondent based this allocation upon Mr. Jones' election not to contest his receipt of $ 12,000 from embezzlement proceeds in 1988. The additional $ 3,000 represents a month's worth of the $ 24,000 salary or consulting fees that Mr. Jones received from Babcock/Traxion. This latter figure is consistent with respondent's records showing that Mr. Jones received salary or fee payments of $ 21,000 in 1987. Mr. Jones argues that a Form 1099 and other now-missing records support his claim that he received much less than $ 94,000 from Babcock/Traxion. Even if such records were before us, they would not persuade us. We are aware Mr. Jones was in charge of the Babcock/Traxion financial records in 1987 and 1988. That fact would cast considerable doubt upon their validity. Mr. Jones' arguments have not shown respondent's allocation to be incorrect or unreasonable. We find that Mr. Jones did receive *273 this amount. [14]
The most important item of income for 1988 was gain from the sale or disposition of the "Smart" lots. In December of 1988, petitioners subdivided some of their farm property into 31 lots. Six of those *274 lots were transferred to Janice Newlove, Mrs. Jones' sister, in exchange for the net proceeds from the sale of a duplex apartment building Ms. Newlove owned in California. The net proceeds (after paying off a mortgage on the duplex) came to $ 226,627. [15] Mr. Jones reported a basis in the properties transferred of $ 193,476, indicating a gain on the transaction of $ 33,151. Respondent disagrees with petitioners' basis figures. Because it was a "new matter", respondent bears the burden of proof on this issue. Respondent computed petitioners' basis by starting with petitioners' original purchase price of the farm property, $ 148,550. From this amount, respondent subtracted $ 70,610, the amount which petitioners had allocated to depreciable assets on their depreciation schedule. This left a basis figure of $ 77,940 allocable *275 to the land that had been partitioned into residential lots. Respondent divided this figure by the 31 lots into which, respondent determined, petitioners had subdivided their property. Respondent multiplied the resulting single-lot figure, $ 2,515, by six, to compute the basis for the six lots transferred to Mrs. Newlove. This yielded a basis attributable to the land in the properties transferred of only $ 15,085. To this figure, respondent then added $ 70,752, the depreciated basis of the buildings on the lots transferred to Mrs. Newlove, indicating a basis of $ 85,837, and a taxable gain of $ 140,790. Respondent's methods are straightforward, and the figures she uses are reflected in the documents in evidence. Respondent met her burden of proof. Accordingly, the burden of producing countervailing evidence shifted to petitioners. However, they failed to show that respondent's determination was incorrect. Petitioners allege that, by the end of 1988, they had spent some hundreds of thousands of dollars in development. These costs, petitioners argue, indicate that their basis was at least the $ 193,476 reported. Once again, however, petitioners have offered no records or *276 other credible and relevant evidence to show how much they had spent toward the development of their subdivision property in 1988. Petitioners urge that a seller may include development costs in basis if the seller is contractually bound to incur such costs. Petitioners, however, have failed to show that they were so bound at the close of 1988. Cf. Rev. Proc. 75-25, 1975-1 C.B. 720. Petitioners also argue that respondent made improper basis adjustments with respect to some buildings and a trailer located on the lots at issue. They have not backed up their argument with convincing evidence. Respondent therefore has carried her burden of establishing that the cost basis was only $ 85,837, and that the resulting gain was $ 140,790. This amount exceeds by $ 107,639 the gain reported on petitioners' tax return for 1988. For 1988, petitioners additionally argue that Mr. Jones spent $ 12,517 in attempting to acquire W.T. Rawleigh. Mr. Jones has provided no records or other impartial evidence showing that this amount was, in fact, a deductible expense. We note that, in general, expenses, including legal expenses, made to acquire a business *277 are not deductible. Instead, they must be capitalized. See Woodward v. Commissioner, 397 U.S. 572 (1970). Petitioners argue that unsuccessful acquisition costs may be deducted in the year the acquisition attempt fails. But they have not demonstrated any relevant details of Mr. Jones' alleged acquisition attempt, including the necessary evidence that Mr. Jones' acquisition attempt failed in their taxable year 1988. Petitioners have failed to establish that $ 12,517 should be considered a deduction or offset against income for 1988. The unreported Babcock/Traxion income of $ 15,000 and the unreported gain on the transfer of the lots of $ 107,639 total $ 122,639 for petitioners' 1988 tax year. Addition to Tax -- Fraud
Respondent determined that petitioners are liable for additions to tax for fraud under section 6653(b) for 1981-1988. Congress has modified the additions to tax during the years in issue. First, the addition under section 6653(b) as it was in effect prior to September 3, 1982, applies to petitioners' 1981 taxable year. The addition is 50 percent of the underpayment. Pursuant to the terms of section 6653(b), the fraud addition *278 attaches to the entire underpayment even if only a portion of it is actually attributable to fraud. Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Breman v. Commissioner, 66 T.C. 61 (1976). For petitioners' taxable years 1982 through 1985, the fraud addition under section 6653(b)(1) remained at 50 percent of the entire underpayment. For those years, however, Congress also imposed an interest addition equal to 50 percent of the interest due on the portion of the underpayment due to fraud. See sec. 6653(b)(2), as added by sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 616. That interest was computed from the date the return was due to be filed. For 1986 and 1987, section 6653(b)(1)(A) provides for an addition to tax in an amount equal to 75 percent of the portion of the underpayment attributable to fraud. Moreover, section 6653(b)(1)(B) adds to the tax an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to fraud. For purposes of those provisions, section *279 6653(b)(2) states that, if the Commissioner establishes that any portion of an underpayment is due to fraud, the entire underpayment is treated as fraudulent, unless the taxpayer proves some portion of the underpayment is not due to fraud. See Tax Reform Act of 1986, Pub. L. 99-514, sec. 1503(a), 100 Stat. 2085, 2742-2743. For 1988, section 6653(b) retained the provision for an addition to tax equal to 75 percent of the portion of the underpayment attributable to fraud. Once again, if the Commissioner establishes that any portion of an underpayment is due to fraud, the entire underpayment is treated as fraudulent, unless the taxpayer proves some portion of the underpayment is not due to fraud. See Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 1015(b)(2)(B), 102 Stat. 3342, 3569. The Commissioner has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The Commissioner must prove fraud for each year she determines the addition to tax under section 6653(b). Shaw v. Commissioner, 27 T.C. 561 (1956), affd. 252 F.2d 681 (6th Cir. 1958). To satisfy her burden of *280 proof, the Commissioner must show two things: (1) An underpayment exists; and (2) the taxpayers intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989). The first element requires the Commissioner to establish the existence of an underpayment. Section 6653(c) defines an "underpayment" in essentially the same manner as a "deficiency" to mean the amount by which the tax imposed exceeds the amount of tax shown by the taxpayer on his return. Sec. 6211. To prove an underpayment, the Commissioner cannot satisfy her burden by relying solely on petitioners' failure to discharge their burden of proving error in her determination of the deficiency. Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). Here, respondent has proved that an understatement exists for the years 1981, 1982, and 1985 through 1988. Respondent's proof includes petitioners' statements to lenders and petitioners' concessions of unreported income. For 1983, *281 however, our findings show that petitioners incurred a net loss, in view of the farm losses they incurred that year. Moreover, for 1984, respondent's concessions result in another net loss for petitioners. There is thus no "underpayment" of income tax for those years. Accordingly, for those 2 years, there can be no liability for the additions for fraud except to the extent that respondent prevails on the issue of self-employment tax. Sec. 6653(c). Additionally, it is possible that tax credit or loss carrybacks and carryovers will eliminate petitioners' income tax liabilities for the other years before us. Nonetheless, as set forth below, there is a fraud penalty for those years, because carrybacks from subsequent years are not permitted to reduce underpayments for purposes of computing fraud penalties. Arc Elec. Constr. Co. v. Commissioner, 923 F.2d 1005, 1009 (2d Cir. 1991), affg. on this issue and revg. T.C. Memo. 1990-30; Auerbach Shoe Co. v. Commissioner, 21 T.C. 191, 196 (1953), affd. 216 F.2d 693 (1st Cir. 1954). Respondent must also prove fraudulent intent *282 on the part of petitioners. Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106. Furthermore, fraudulent intent may be more easily inferred where the taxpayer is intelligent, educated, and knowledgeable about taxes. O'Connor v. Commissioner, 412 F.2d 304, 310 (2d Cir. 1969), affg. on this issue T.C. Memo. 1967-174; Simms v. Commissioner, T.C. Memo. 1968-298, affd. 422 F.2d 340 (4th Cir. 1970). Over the years, the courts have developed a nonexclusive list of the various kinds of circumstantial evidence that may support a finding of fraud. The "badges of fraud" that come into consideration here include: (1) A pattern of understatement of income, *283 (2) inadequate books and records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of assets, (6) failure to cooperate with tax authorities, (7) filing false forms, (8) engaging in illegal activity, and (9) attempting to conceal illegal activity. See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992) (citing Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601)). The facts of this case show at least some of these factors present in each of the years before us. Taken together, these factors show that petitioners' understatements of tax in each year are a result of fraud. Mr. Jones is an educated and highly intelligent individual, very conversant with the ramifications of the income tax laws and the filing of income tax returns. He states that he passed the C.P.A. exam before he even graduated from college. He has made no secret of his abilities to handle corporate taxes. He testified that he knows how to handle a complicated consolidated income tax return. He has pointed out his ability to minimize, *284 "especially through net operating loss carry forwards", Federal income tax liabilities. He maintained an income tax service and had a contract to do so with a Montgomery Ward & Co. store. He bragged that he did not pay taxes. To William Babcock, the employer from whom he later embezzled large sums of money, Mr. Jones stated that he had never paid taxes and that nobody should. Mr. Jones required that Mr. Babcock pay him as a consultant, not as an employee, because "he didn't want to pay taxes on it." To Mr. Babcock, Mr. Jones "seemed to think he was smart enough to be able to get out of any kind of taxes that was supposed to be paid. That was his boast." Mr. Jones argues, however, that he was sufficiently conversant with income taxes to know that the carryback or carryover of farm losses would eliminate much, if not all, of his taxable income for the years in issue. Because petitioners would face little or no tax liability, Mr. Jones concludes, they must have lacked the intent to evade tax that is needed for the imposition of the fraud penalties. We disagree. Mr. Jones knew that failing to report substantial amounts of income would generate large net operating losses. Mr. *285 Jones knew how to use these losses to offset taxable income over a period of years. It is settled that "a deficiency is due to fraud where it is caused by the carryback or carryover of a fraudulent loss." Arc Electric. Const. Co. v. Commissioner, supra at 1010. We think petitioners' omissions of large amounts of income were deliberate and fraudulent, because such omissions generated net operating losses that could be used to offset income in other years. Another factor that indicates the underpayments in issue were due to fraud relates to the pattern of understatements. Such a pattern exists here. For all 8 years in issue, petitioners indicated that they were not required to pay any income tax. We have found that they underreported income for 6 of the 8 years at issue. Additionally, petitioners' books and records were inadequate. While working as the head of a domestic subsidiary of a foreign-based corporation, Mr. Jones was involved in the acquisition and operation of a number of other companies. He also ran an income tax service, and he was hired as controller to Mr. Babcock. Mr. Jones was particularly aware of the necessity to keep books *286 and receipts concerning these multiple operations, but he did not do so. His records were sparse and sporadic. They fell far short of being "permanent books of account or records * * * sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax". Sec. 1.6001-1(a), Income Tax Regs.
Moreover, petitioners failed to file timely tax returns. For the years 1980 through 1988, it appears that they filed only their 1981 return on time. The others were delinquent, for periods varying between a few months to several years. Mr. Jones' explanations for his failure to file tax returns were bizarre and unacceptable. Although he urges that he did timely file the 1982 and 1983 returns, the record establishes that the returns were not filed until provided to Revenue Officer Pelt on October 5, 1987. With respect to the 1984 through 1986 returns, Mr. Jones contends that he was in danger of his life if he revealed anything about an associate's dealings with tax credits. This associate apparently was also involved with other entities from which Mr. Jones received income. Hence, Mr. Jones maintains that *287 he did not file his tax returns because it was too risky. Mr. Jones conceded, however, that he did report income from those same entities to lending institutions for the same periods. Mr. Jones testified that he intended to file amended returns for those years, but he never did so. For the years 1987 and 1988, Mr. Jones claims that one of respondent's agents instructed him not to file timely tax returns. We do not accept that claim. Another factor indicative of fraud is the concealment of assets. Mr. Jones has used a number of means to disguise his assets, particularly his acquisition of income. He utilized an alter ego corporation named RWK Superior Productions to provide a name through which he handled personal as well as business transactions. He had no bank account in his name after 1984. Although Mr. Jones possesses a sure and certain knowledge about how to fill out personal income tax forms, he nevertheless reported the income from Computer Tax Service as "income tax" on the farm income and expense portion of his Federal income tax returns. He characterized income from Timeless Apparel, from another entity named Tuscarora, and from W.T. Rawleigh as "miscellaneous" *288 income on his 1987 return. Furthermore, in 1987, Mr. Jones also placed a lien of $ 978,000 upon petitioners' real property (Reata) in favor of his son shortly after the Internal Revenue Service began to investigate. He removed that lien in a document executed by his son and recorded on July 13, 1989. Finally, on his income tax returns, Mr. Jones reflected his business as "farmer", or, in 1988, as "developer". He did not reveal on his income tax returns that he was involved in many of the business entities from which he obtained income during the years at issue. Mr. Jones contends that he placed the $ 978,000 lien on Reata to protect his home and farm from unwarranted personal injury claims. However, absent any evidence to substantiate his explanations, we find that the lien was an attempt to frustrate the collection of petitioners' income taxes by respondent. Another "badge of fraud" present in this case is the failure to cooperate with the agents of the Internal Revenue Service. When Mr. Jones was contacted by the Internal Revenue Service in 1987, he lied about having filed timely returns, first to Revenue Officer Pelt and later to Special Agent Williams. The failure to cooperate *289 continued through the preparation for, and presentation of, the trial in this case. Petitioners also used false documents. Mr. Jones supplied misleading documentary information to lenders beginning as early as 1981 and continuing until at least 1987. In 1982, Mr. Jones provided 6,000 shares of stock in a publicly traded corporation as security for loans, together with a letter indicating that the shares were to be redeemed for $ 104,000. By 1987, those officials had determined that petitioners owned only 100 shares. Mr. Jones claims that the lenders knew the documents had been altered, but we do not accept that claim. Two more indications of fraudulent activity are criminal activity and attempting to conceal such activity. In the case at hand, the record shows that Mr. Jones is an embezzler. In the years 1987 and 1988, he used his position as a comptroller to steal money from Mr. Babcock and to destroy the records that would reveal his illegal activities. He was subsequently convicted of embezzlement in 1992. His concealment of that illegal activity continued at the trial before this Court. During trial, Mr. Jones attempted to introduce a blatantly self-serving document *290 -- identified as petitioners' Exhibit 42 -- that he falsely claimed Mr. Babcock signed. In that document, Mr. Babcock allegedly conceded that Mr. Jones properly received some $ 56,000 from the Babcock Agency, and that Mr. Jones had signature authority for checks written on Mr. Babcock's business. From the evidence presented, we find Mr. Babcock's signature on that document to be a forgery and further find that Mr. Babcock never authorized Mr. Jones to take the funds at issue. Having viewed his performance at trial, we are convinced that Mr. Jones is not a credible individual. He tells the truth only when it serves his perceived purpose, and he lies readily when doing so will help. We are not convinced that Mr. Jones filed accurate tax returns. Doing so was against his announced principles; he genuinely thought he was too smart to do so. We find Mr. Jones is liable for the fraud additions for the underpayments that exist for the years 1981, 1982, and 1985 through 1988. The evidence as to fraud on the part of Mrs. Jones is not as complete. We are convinced, however, that she was Mr. Jones' knowing accomplice in his attempts to avoid paying income taxes. She signed loan applications *291 that indicated the receipt of large amounts of income for the years 1981, 1982, and 1983. These amounts were far greater than the amounts reported on the Federal income tax returns which she also signed. She was aware of her responsibility to file Federal income tax returns for the years 1982 through 1988, yet she did not do so. In 1988, she participated in the scheme to transfer the Reata property entirely into her name -- an attempt, we believe, to shield the property from liabilities caused by Mr. Jones in his overt attempts to evade tax. Accordingly, we find that respondent has demonstrated that Mrs. Jones also is liable for the additions to tax for fraud for 1981, 1982, and 1985 through 1988. For each of the years before us in which there was an understatement, at least part of that understatement was due to fraud. For their years 1986 through 1988 petitioners have not proved that any part of the understatements was not due to fraud. We thus hold that the entire understatement in each of the years 1986, 1987, and 1988 is due to fraud. For the taxable years 1982 and 1985, in which there were understatements, respondent is required to prove the amount of the underpayment *292 that is attributable to petitioners' fraud in order to apply the addition to tax of 50 percent of the interest payable. See Hughey v. Commissioner, T.C. Memo. 1994-116; Franklin v. Commissioner, T.C. Memo. 1993-184. Of the $ 100,000 not reported for 1982, respondent has proven that petitioners' failure to report the $ 11,162 received in payment on the C&W Texaco and Nichols notes plus the $ 50,000 default judgment were due to fraud. Petitioners knew they were required to report such income, but they did not. Accordingly, of the amount of the understatement for 1982, some 61.162 percent is attributable to fraud for purposes of section 6653(b)(2). For 1985, respondent has proved that petitioners' failure to report 85.446 percent of the amounts at issue -- that is, $ 88,202 from Society Brands, Inc., $ 6750 from W.T. Rawleigh, $ 5,000 from Timeless Apparel, and $ 900 from Viola Sportswear -- is attributable to fraud. Respondent has not proved that the understatement attributed to the disputed amount of reimbursed expenses -- some $ 17,718 -- is due to fraud. Accordingly, 85.446 percent of the understatement for 1985 *293 is attributable to fraud for purposes of section 6653(b)(2). Period of Limitations
Petitioners raise a defense to the asserted deficiencies based upon the period of limitations with respect to the years 1981 through 1984. Section 6501(a) and (b) provides that the amount of a deficiency in Federal income tax is to be assessed within 3 years after the later of two dates: (1) the date the tax return for the year in issue was filed, or (2) the due date of that return. Section 6501(c), however contains an exception -- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.
Here petitioners concede that their Federal income tax returns for the years 1982 through 1984 were not filed until October 5, 1987. This date was within 3 years of June 12, 1990, the date of mailing of the notice of deficiency. Section 6501(a) thus does not bar the assessment of Federal income taxes for 1982 through 1984. Respondent agrees, however, that petitioners timely filed their Federal income tax return for 1981. Accordingly, respondent has the burden *294 of pleading and proving the existence of an exception to the period of limitations. Stratton v. Commissioner, 54 T.C. 255, 289, modified 54 T.C. 1351 (1970); Farmers Feed Co. v. Commissioner, 10 B.T.A. 1069 (1928); see Miami Purchasing Serv. Corp. v. Commissioner, 76 T.C. 818, 823 (1981). This burden is the same as that which respondent bears under section 6653(b) to show that a taxpayer is liable for the addition to tax for fraud. Asphalt Indus. Inc. v. Commissioner, 384 F.2d 229, 232 (3d Cir. 1967), revg. on other grounds 46 T.C. 622 (1966); Botwinik Bros. v. Commissioner, 39 T.C. 988, 996 (1963). We have earlier found that petitioners' 1981 return was fraudulent with the intent to evade tax. Accordingly, the bar of the statute of limitations does not apply to their 1981 taxable year, and we may determine both deficiencies and additions to tax for that year. Self-Employment Tax
Section 1401 imposes a tax upon the self-employment income of every individual. Section *295 1402(b) defines "self-employment income" to be the "net earnings from self-employment derived by an individual". Section 1402(a) explains that such net earnings "means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed * * * attributable to such trade or business". With respect to individuals who are married, only the spouse carrying on the trade or business will be subject to the self-employment taxes. The question of which spouse carries on the trade or business is a question of fact to be determined on a case-by-case basis. See O'Rourke v. Commissioner, T.C. Memo. 1993-603; cf. sec. 1.1402(a)-8(a), Income Tax Regs.; Rev. Rul. 82-39, 1982-1 C.B. 119 (citing Carrasco v. Secretary of Health, Education and Welfare, 628 F.2d 624 (1st Cir. 1980)). In this case, respondent seeks to impose self-employment taxes upon Mr. Jones for the years 1982 through 1988. [16] Mr. Jones is liable for such taxes. He has insisted upon being classified as a consultant, so that income taxes will not be withheld from his *296 salary. When he obtained money during the years at issue, he did so as the principal officer of the business involved, or at least as the officer in charge of financial affairs. He had the discretion to treat himself as a consultant or independent contractor, and apparently he did so. On this record, he certainly has not proven that he was an employee victimized by an employer's failure to make withholding payments. We will not countenance his attempts to blame others for his failure to pay self-employment tax. Mr. Jones further *297 argues that he has no net earnings from self-employment. Any such earnings, he argues, have been eliminated by his farm losses for the years in issue. The flaw in his argument is that the farm losses were not his losses. They were losses of Mrs. Jones. Mrs. Jones testified that she sought to promote and utilize Reata as a horse farm from the time she and Mr. Jones bought it until the time they began to develop it as a residential subdivision. She stated her only job was as a horse "farmer", stating that she "didn't have time to do anything else". At the jeopardy assessment hearing in 1991, Mrs. Jones was asked to describe her understanding of her husband's business affairs from 1978 until the present time. She replied: Quite frankly, I don't know how to describe what he does, because I don't know that much about his business. I know he's sometimes called a consultant, sometimes has other titles, but I don't know what his business was or what he really did. I just didn't have time to get into any of his business. I had a business that I was trying to run myself. [Emphasis supplied.]
She further clarified that the "business" that she was trying to run by *298 herself was the farm. The records of FLB/PCA indicate that only Mrs. Jones, and not Mr. Jones, was the buyer or owner of the horses on the farm. A full-page advertisement for a stud service for a horse named "Cadillac Polite" lists only "Penny Jones Owner." When the Federal Land Bank sought information regarding the availability of funds from horse sales, it addressed its letter "Dear Penny". The facts of record show that she was responsible for running the farm, while he was engaged in his various other business pursuits. The record contains further evidence that Mr. Jones was a self-employed consultant. In 1983, Mr. Jones reported that he had traveled to Saudi Arabia in search of a new business opportunity. Mrs. Jones was left to answer repeated telephone inquiries from the bank. In January of 1985, Mr. Jones reported that he was "planning to be in Summerfield every other weekend." In 1986, the records of the Federal Land Bank indicated that "Bill now works with Timeless II Apparel Inc., * * * in Johnson CityTenn." In addition, information in the Federal Land Bank's files states: "Bill's job keeps him in New York, St. Louis or El Paso most of the time. He is able to get *299 home about once a month. Penny is primarily responsible for the management of the horse operation." As of May 1989, Mr. Jones stated: at that point in time I was leaving for New Zealand, where I was pursuing a business opportunity for - pursued it for two months and came back for a couple of months, and went back and pursued it again. * * * She would not move to New Zealand * * * she was definitely not interested in the lifestyle that I wanted to have. And I wasn't interested in her lifestyle, because I didn't want to live in the country with dogs.
We accordingly find Mr. Jones is subject to self-employment tax and that his self-employment income is not to be diminished by the farm losses. [17]
Addition to Tax -- Substantial Understatement
Respondent has also asserted an addition to tax under section 6661. Section 6661(a) *300 provides that if there is a substantial understatement of income tax, there shall be added to the tax an amount equal to 25 percent of any underpayment attributable to such understatement. An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return. Sec. 6661(b)(2). An understatement is substantial if it exceeds the greater of (1) 10 percent of the tax required to be shown on the return, or (2) $ 5,000. Sec. 6661(b)(1) This threshold amount must be met before the penalty applies. Liability for self-employment taxes is taken into account for purposes of making the determination of the threshold amount. Cameron v. Commissioner, 98 T.C. 123 (1992), affd. 15 F.3d 1083 (9th Cir. 1994). The amount of any understatement is to be reduced for an item, however, if there was substantial authority for the treatment of that item by the taxpayer. Sec. 6661(b)(2)(B)(i). The amount of any understatement is also to be reduced for an item if there was adequate disclosure in the return of the relevant facts affecting treatment of that item by the taxpayer. Sec. *301 6661(b)(2)(B)(ii). With respect to the addition to tax under section 6661, the burden of proof is on petitioners. King's Court Mobile Home Park v. Commissioner, 98 T.C. 511, 517 (1992). Petitioners have shown no substantial authority for the failure to include items of income on a Federal tax return, nor have they shown substantial authority for their failure to report and substantiate an adequate tax basis for the lots transferred to Mrs. Newlove. Additionally, they failed to set forth in their return the relevant facts concerning their understatements. We hold that petitioners are liable for the addition to tax under section 6661, as to the full amount of any understatement for a year in issue that exceeds the greater of $ 5,000, or 10 percent of the tax required to be shown on their return. We leave it to the Rule 155 computations to ascertain whether petitioners fall within the arithmetical standards for imposition of this addition. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. For petitioners' taxable years 1982 through 1985 and 1988, the additions for fraud were determined pursuant to sec. 6653(b)(1). For the years 1986 and 1987, the additions for fraud were determined pursuant to sec. 6653(b)(1)(A). Respondent additionally determined that petitioners were subject to additions of 50 percent of the interest due on the determined deficiencies under sec. 6653(b)(2) for their taxable years 1982 through 1985, and under sec. 6653(b)(1)(B) for their taxable years 1986 and 1987.↩
1. These entities, which operated as joint organizations, later became known as the North Central Farm Credit Service.↩
2. With their 1981 return, Mr. Jones sent to respondent a letter explaining that he had neglected to file his 1980 return and enclosed a copy. The 1980 return showed a loss of $ 1,661.↩
3. At trial respondent introduced a "Source and Application" analysis of petitioners' receipts and expenditures for the years in issue. Respondent offered this analysis as substantiation of amounts determined to be unreported income under the specific items method. We have not found it necessary to evaluate this analysis. In the years 1981 through 1988, petitioners reported net farm losses totalling approximately $ 524,000. They reported nonfarm receipts totalling approximately $ 131,600. This works out to approximately $ 16,450 per year. Based upon the record evidence showing petitioners' lifestyle and expenses, we do not believe that they could have subsisted on these amounts. We note, however, that, for the years before us, petitioners have now conceded the receipt of an additional $ 240,000, none of which they reported as income on their Federal income tax returns.↩
4. That petitioners represented themselves before this Court provides no excuse for their failure to establish their claims. It is clear that allowing a litigant to represent himself or herself does not excuse compliance with the relevant rules of procedural and substantive law. Faretta v. California, 422 U.S. 806, 835 n.46 (1975); United States v. Ellsworth, 547 F.2d 1096, 1098↩ (9th Cir. 1976).
5. We are aware that Mr. Jones filed a complaint in a North Carolina State court, seeking to recover the purportedly unpaid portions of a $ 75,000 annual salary from the Williams Hudson Group. Although this complaint reflects an annual salary of less than $ 100,000, Mr. Jones has testified that, in claiming less than his full salary, he was following his lawyers' advice. The lawyers knew that Mr. Jones had claimed an additional $ 120,000 in unpaid salary in a bankruptcy proceeding involving the MARSCO subsidiaries.↩
6. Petitioners also claim that they understated their interest payments in 1981 by some $ 14,705. They raise this issue for the first time in a letter submitted after trial and submission of opening briefs. It thus came too late in the proceedings for consideration. Frentz v. Commissioner, 44 T.C. 485, 490-491 (1965), affd. 375 F.2d 662 (6th Cir. 1967); Shoemaker v. Commissioner, 38 T.C. 192, 201↩ (1962).
7. Even the amount of $ 37,500 from Carolina Narrow Fabric is suspicious. Mr. Jones headed operations of Carolina Narrow Fabric in 1981, and the Form W-2 upon which his salary is reported -- although allegedly prepared by a "Big 8" accounting firm -- is handwritten.↩
8. Petitioners apparently submitted two versions of this return to lenders. One indicated salary and business income of $ 87,000 and farm income of $ 32,592. The other version indicated salary and business income of $ 166,196, and farm losses of $ 14,012. Of this latter version, the copy that petitioners filed in evidence here bears the word "draft" twice on the top of the document. The version submitted to the lender does not bear the word "draft".↩
9. Mr. Jones has placed in evidence a document, allegedly received from Great Britain, indicating that Williams Hudson, Ltd. was placed into receivership as of Mar. 1, 1982. Petitioners failed to prove the practical or legal effect of this document. We note, however, that even if the parent company ceased its activities, Mr. Jones still had sources of income and note payments from the acquired companies in the United States. Additionally, Mr. Jones indicated that after 1982 he maintained contact with David Rowland in attempting to recover additional amounts Mr. Jones believed he was owed.↩
10. On brief, petitioners assert that the matter of this lawsuit is not properly before the Court. Respondent mentioned this item in the notice of deficiency, however, and the parties contested the item in their pleadings. The matter of the lawsuit does not increase the proposed deficiencies. The matter of this lawsuit is thus properly before the Court.↩
11. Respondent has produced a microfilm copy of the check to Mr. Pate which bears the endorsement of Mrs. Jones. Petitioners have demonstrated to our satisfaction, however, that this endorsement was likely made to another check, and that an error was made in the bank's photocopying of its records.↩
12. Petitioners have called attention to the fact that the balance sheet at issue refers to a company called "Timeless II Apparel, Inc." and not "Timeless Apparel, Inc." The former company apparently was a successor to the latter. In any event, the document reflects $ 15,728 in income to Mr. Jones. He did not demonstrate otherwise.↩
13. There is no dispute that petitioners received at least $ 34,743 from Timeless in 1986. Respondent's concession of amounts in excess of $ 15,728 is apparently a concession that Mr. Jones reimbursed Timeless for a number of his expenses. On brief, the parties contest respondent's decision not to credit Mr. Jones with another $ 13,824 in expense reimbursements. Respondent refused to do so, because, in respondent's view, the check in that amount to Timeless did not clear the bank. Petitioner has produced some inconclusive records in attempting to prove that the check did, in fact, clear the drawee bank. Petitioners, however, have not met the threshold requirement of demonstrating that the check to Timeless represented a reimbursement of expenses that should be subtracted from their 1986 income.↩
14. Petitioners object to our consideration of some of respondent's records and much of Babcock's testimony. Petitioners argue that here, and elsewhere, respondent did not identify such evidence in responding to pretrial discovery. Petitioners, however, have mischaracterized those responses. Suffice it to say that petitioners have not shown that respondent failed to comply with the provisions of our Rule 102 relating to supplementation of responses in discovery. Moreover, petitioners have not shown that respondent's alleged failure to identify documents or statements was prejudicial in view of petitioners' burden of proving their case and their intimate knowledge of the matters at issue. See Murphy v. Magnolia Elec. Power Association, 639 F.2d 232↩ (5th Cir. 1981)
15. The amounts involved in the computation of basis have been adjusted to eliminate amounts attributable to some trailers on the property that were apparently disposed of in another transaction.↩
16. Respondent points out that, for 1988, Mr. Jones should be liable for self-employment taxes only on the amounts of income from Babcock/Traxion. Respondent has determined that Mr. Jones' gain on the duplex sale is not subject to such taxes. Additionally, Mr. Jones produced a Form W-2 from Carolina Narrow Fabric for 1981. The form was ostensibly prepared by a major accounting firm, and respondent has not chosen to contest Mr. Jones' liability for self-employment taxes for that year.↩
17. We also note that Mr. Jones' underpayments of self-employment tax for the years at issue are subject to the additions to tax for fraud. See secs. 6653(c), 6211(a), 1401(a).↩